**Furman CRAIN, Sr., Plaintiff,**

v.

**The FIRST NATIONAL BANK OF OREGON, PORTLAND, a national banking association, Defendant,**
**and**
**United States of America, Intervenor.**

**Civ. No. 61–464.**

United States District Court
D. Oregon.
June 21, 1962.

Forrest E. Cooper, Lakeview, Or., Clifford B. Alterman, Kell & Alterman, Portland, Or., for plaintiff.

Charles E. Wright, Pendergrass, Spackman, Bullivant & Wright, Portland, Or., for defendant.

Sidney I. Lezak, Acting U. S. Atty., Portland, Or., for intervenor.

Elbert L. Mikesell, Grants Pass, Or., amicus curiae.

EAST, District Judge.

This Court has jurisdiction of the parties and the subject matter of this action under Title 28 U.S.C.A. §§ 2201–2.

The plaintiff was a member of the Klamath Indian Tribe and is an enrollee of the later-described final tribal roll.

The defendant is a national banking association with its head office in Portland, Oregon, and is acting as a trustee in the possession and management of the plaintiff's estate pursuant to the terms and provisions of a trust arrangement, established without the joining of the

plaintiff, between the defendant and the Secretary of the Interior (Secretary).

The United States of America petitioned and was granted leave to join as an intervenor herein. Mr. Elbert L. Mikesell, an attorney of Grants Pass, Oregon, has appeared by brief amicus curiae.

## ACT OF CONGRESS AND ACTION OF SECRETARY INVOLVED

An Act of Congress popularly known as the Klamath Termination Act (Act), providing for termination of Federal supervision over the Klamath Indian Tribe, was enacted by the 83rd Congress on August 13, 1954. That law is codified as Title 25 U.S.C.A. § 564.

Under the terms of the Act, the tribal roll was closed as of August 13, 1954, and thereafter the Secretary, pursuant to the directions of the Act, caused to be established the final tribal roll and published the same in the Federal Registry on March 13, 1958.

Section 564d of the Act provides that immediately after appraisal of the tribal properties and approval thereof by the Secretary, each enrollee was given an opportunity to elect to withdraw from the tribe (and have his interests in the tribal property converted into money and paid to him) or to remain in the tribe and participate in the tribal management plan. Plaintiff duly elected to withdraw from the tribe.

Section 564n of the Act, as amended, provides that prior to the transfer or paying over of the money representing the withdrawing enrollee's interest in the tribal property, as provided, "the Secretary shall protect the right of members of the tribe who are minors, *non compos mentis*, or in the opinion of the Secretary in need of assistance in conducting their affairs, by causing the appointment of guardians for such members * * * or by such other means as he may deem adequate without application from the member, including but not limited to the creation of a trust of such member's property with a trustee selected by the Secretary, * * * ".

On or about June 10, 1958, the Secretary, pursuant to the authority of § 564n, determined the plaintiff to be "in need of assistance" in conducting his affairs and selected the defendant as trustee to receive and administer the plaintiff's liquidated share of tribal properties. On June 17, 1958, the Secretary and the defendant executed and made delivery of the trust agreement referred to as Exhibit A to defendant's answer.

## ISSUE PRESENTED

The sole issue presented by the pleadings is whether the trust agreement and resultant trustee's possession and management of plaintiff's properties is void *ab initio* for the reason that that part of the Act authorizing the execution of the trust agreement aforesaid violates the plaintiff's Constitutional rights, at least to the extent that his property is taken without due process. As stated in the defendant's brief, the plaintiff does not complain of the trustee's administration of his estate nor has he requested that some other agency manage his property. The plaintiff's sole reason for bringing this action is to acquire complete and uncontrolled use of his liquidated share of tribal properties.

## RELATIONSHIP BETWEEN THE UNITED STATES AND THE INDIANS

A few selected excerpts from the decisions of the Supreme Court of the United States can more poignantly describe the role of the United States of America over the Indians than can the language of the writer. An early classic, although harsh, treatment of this rule is taken from United States v. Kagama, 118 U.S. 375, 383, 384, 6 S.Ct. 1109, 30 L.Ed. 228 (1885):

"These Indian tribes *are* the wards of the nation. They are communities *dependent* on the United States. Dependent largely for their daily food. Dependent for their political rights. They owe no allegiance to the States, and receive from them no protection. Because of the local ill feeling, the people

of the States where they are found are often their deadliest enemies. From their very weakness and help-lessness, [which is] largely due to the course of dealing of the Federal Government with them and the treaties in which it has been prom-ised, there arises the duty of pro-tection, and with it the power. This has always been recognized by the Executive and by Congress, and by this court whenever the question has arisen.

"The power of the General Gov-ernment over these remnants of a race once powerful, now weakened and diminished in number, is neces-sary to their protection, as well as to the safety of those among whom they dwell. It must exist in that government, because it never had existed anywhere else, because the theatre of its exercise is within the geographical limits of the United States, because it has never been denied, and because it alone can en-force its laws on the tribes."

A more charitable, but equally frank, statement of the source and continued exercise of this power and duty by the Government is found in the case of Board of Com'rs of Creek County v. Seber, 318 U.S. 705, 715, 63 S.Ct. 920, 87 L.Ed. 1094 (1942):

"This power is not expressly granted in so many words by the Constitution, except with respect to regulating commerce with the Indian tribes, but its existence cannot be doubted. In the exercise of the war and treaty powers, the United States overcame the Indians and took pos-session of their lands, sometimes by force, leaving them an uneducated, helpless and dependent people, need-ing protection against the selfishness of others and their own improvi-dence.

"Of necessity, the United States assumed the duty of furnishing that protection, and with it the authority to do all that was required to per-form that obligation and to prepare the Indians to take their place as independent, qualified members of the modern body politic."

We only remind ourselves of the fact, without comment thereon, that the Gov-ernment has from time to time estab-lished educational, rehabilitation and cul-tural facilities and advantages for the Indians to the point where it has, over a period of years, brought about the gradual termination of supervision by the Government over the various Indian tribes and the granting of citizenship to the individual, culminating, so far as we are presently concerned, in the Act of Congress under consideration. Everyone concerned is happy with the general termination of governmental guardianship of a tribal society and the recognition of the dignity of the in-dividual, thus bringing to an end a policy of governmental guardianship by reason of one being a member of a given race, and the establishment of a continued private guardianship because of individ-ual proclivities only. This recognition of the individual allows the Indian to elect to remain with the likened-to com-munal-management society of tribal man-agement of the tribe's property or to be entirely emancipated and endowed with the possession and management of his own allotted share. However, it is a part of this individualized treatment to which the plaintiff ironically objects, namely, that part of § 564n which per-mits the Secretary to enter a determina-tion when in the opinion of the Secretary, by reason of *individual* deficiencies,[1] the particular Indian individual is "in need

---

1. "This need of assistance is the result of the individual's emotional or mental pro-clivities which prompts him to waste his money and property and also permits him to be imposed upon by artful or design-ing persons. Such mental or emotional instability may be to the extent of legal mental incompetency, but not necessarily so, as it can be substantially short of such mental status." Tobey v. Udall, 202 F.Supp. 319, (U.S.D.C.Or.).

of assistance" in conducting his affairs and custodial property protection is needed.

The right of the Government, acting through *Congress,* to exercise continued guardianship after termination, was fully treated and established in United States v. Waller, 243 U.S. 452, 459–460, 37 S.Ct. 430, 61 L.Ed. 843 (1916):

> " * * * it is necessary to have in mind certain matters which are well settled by the previous decisions of this court. The tribal Indians are wards of the Government, and as such, under its guardianship. It rests with Congress to determine the time and extent of emancipation. Conferring citizenship is not inconsistent with a continuation of such guardianship, for it has been held that even after the Indians have been made citizens, the relation of guardian and ward for some purposes may continue. On the other hand, Congress may relieve the Indians from such guardianship and control, in whole or in part, and may, if it sees fit, clothe them with full right to responsibilities concerning their property, or give to them a partial emancipation if it thinks that course better for their protection."

See also Brader v. James, 246 U.S. 88, 38 S.Ct. 285, 62 L.Ed. 591 (1917), wherein Congressional restraints upon alienation of an Indian's property following termination were held lawful.

By paraphrasing language found in United States v. Santa Fe Pacific R. R. Co., 314 U.S. 339, 62 S.Ct. 248, 86 L.Ed. 260 (1941), we are taught that the power of Congress in regard to the time and the manner of termination is supreme. The manner, method and time of such termination raises political and not judicial issues.

## PLAINTIFF'S CONTENTION OF A "TAKING" OF HIS PROPERTY

The plaintiff urges that Congress has given him his property and estate with one hand, then intercepted it with the other and put it in trust under the management of a third party, which amounts to a taking of his property without due process. It was the intention of Congress under the Act to grant the Klamath Indians unrestricted citizenship, and it has. But even so, under the language of Brader v. James, supra, the granting of citizenship is not inconsistent with the right of Congress to continue to exercise some type of protection over the new citizen's use and management of his property. See also, Cherokee Nation v. Hitchcock, 187 U.S. 294, 307, 23 S.Ct. 115, 47 L.Ed. 183 (1902). It naturally follows that such restraints cannot be capricious or arbitrary, but must be reasonable restraints in the light of all the circumstances attending.

We all acknowledge that there is, in every jurisprudence in the world, a judicial power to adjudge "a citizen," by reason of mental, physical or emotional deficiencies, incompetent or indeed "in need of assistance" in conducting his affairs. For centuries a deficiency facet of human nature has been recognized, honored and judicially enforced in the spendthrift trusts created by a foreseeing, guardian-like parent.

In determining the intention of Congress with reference to the Act, and particularly the provisions of § 564n, we turn to the published report of the proceedings of the Joint Hearing before the Subcommittees of the Committees on Interior and Insular Affairs, held February 23 and 24, 1954; on page 251 we find the following colloquy:

> "Representative D'Ewart. And does the phrase 'in need of assisttance' have any specific definition?
> "Mr. Sigler. No, Congressman D'Ewart. Those are the words that were intended to suggest that the individual is not able to handle his own affairs in normal business competitive practice without some kind of help, to replace the help that the Federal Government is now providing.

"Those words are not intended to suggest incompetence in the strictly legal sense.

"Representative D'Ewart. I think that makes the record clear on this section."

This Court is willing to adopt as a premise that if the provisions of § 564n granted the Secretary full power without judicial review to determine any Klamath enrollee "*non compos mentis*" or "in need of assistance" in conducting his affairs, such exercise of power would be unconstitutional and violate that individual's Constitutional rights. However, we are not faced with that situation here. The Act in itself sets up procedures for obtaining a judicial adoption or rejection of the Secretary's determination by way of primary proceedings in the nature of a trial *de novo*, with the burden of proof upon the Secretary, as distinguished from a mere review of a record before an administrative officer.[2] Tobey v. Udall, supra (n. 1). This leaves the Secretary with the capacity of merely setting up a stopgap or holding of the matter in status quo during the transition from "tribe" to "individual" in order to prevent irrevocable losses to an individual's estate. One method of protecting the estate of the emancipated member of the tribe who is "in need of assistance" is for the Secretary to petition courts of competent jurisdiction for the appointment of guardians or conservators, this being a judicial proceedings in the first instance. The other method is for the Secretary to make an intermediary administrative determination that the individual is "in need of assistance" to handle his affairs, and then establish a trust for the individual with a third party trustee, as was done in the instant case. Should the individual be aggrieved by such action of the Secretary, he may immediately contest the Secretary's determination. Furthermore, under the law of Oregon the trust established for the plaintiff, from the moment of its creation, became subject to judicial supervision upon appropriate application, and any capricious, arbitrary or unreasonable provision contained therein and adverse to the interests of the plaintiff would be eliminated, or at least unenforced. This trust agreement is before this Court in this proceedings, and while there is no contention made by plaintiff that any of the provisions of the trust are capricious, arbitrary or unreasonable, nor does the plaintiff complain as to the capacity or the practices and policies of the trustee in the management of his estate, nevertheless the Court has reviewed the trust agreement for the purposes of ascertaining whether the same contains any capricious, arbitrary, unreasonable or otherwise unlawful provision as to the handling and management of plaintiff's estate which would tend to violate the plaintiff's Constitutional rights, and finds none.

## CONCLUSION

It therefore follows that Congress had the initial right to and did terminate the Government's role as guardian over the Klamath Tribe and endowed the established members of the tribe with their allotted and liquidated share of the tribal properties. It further had the right to and did establish reasonable protection to those individuals found "in need of assistance" in conducting his affairs under reasonable standards and tests,[3] in order "to replace

2. Title 25 U.S.C.A. § 564n:
" * * * *Provided further*, That any member determined by the Secretary to be in need of assistance in conducting his affairs may, within one hundred and twenty days after receipt of written notice of such secretarial determination, contest the secretarial determination in any naturalization court for the area in which said member resides by filing therein a petition having that purpose; the burden shall thereupon devolve upon the Secretary to show cause why such member should not conduct his own affairs, and the decision of such court shall be final and conclusive with respect to the affected member's conduct of his affairs."

3. Title 25 U.S.C.A. § 564n:
" * * * *Provided, however*, That no member shall be declared to be in need of

the help that the Federal Government" was (is now) "providing." All of this neutralizes any contention that Congress has made a "second-class citizen" of the Klamath Indians. Under no stretch of the imagination has Congress delegated any legislative authority to the Secretary under the provisions of § 564n. On the contrary, the directions and authority to the Secretary are purely administrative in language and nature,[4] with each phase or ultimate result subject to judicial control.

In the opinion of this Court, the entire Act is a Constitutional exercise of the power of Congress and no individual Constitutional right of the plaintiff has been in anywise violated by its provisions or by the determinations and actions of the Secretary thereunder.[5]

The plaintiff complains of and contends that the following provision in the trust agreement "is unconstitutional delegation of the Secretary's authority."

"ARTICLE II

" * * * (c) The Trustee may terminate this trust, to the extent of any part thereof, at any time it shall, in its sole discretion, find the Beneficiary competent, capable, and willing to manage the properties so affected by the termination, by distributing such properties to the Beneficiary as his sole and separate property free and clear of the trust provisions contained herein. In the event the Trustee, in the exercise of the discretion granted under this subparagraph (c), shall distribute to the Beneficiary the trust properties to the extent of the whole of the trust estate, this trust shall terminate and the Trustee shall be discharged of its duties and responsibilities created hereunder."

In answer, it is pointed out that the language of this provision is not a delegation of any authority conferred by law upon the Secretary, it is simply a

assistance in conducting his affairs unless the Secretary determines that such member does not have sufficient ability, knowledge, experience, and judgment to enable him to manage his business affairs, including the administration, use, investment, and disposition of any property turned over to such member and the income and proceeds therefrom, with such reasonable degree of prudence and wisdom as will be apt to prevent him from losing such property or the benefits thereof: * * *."

4. "In the oft-quoted language of the Ohio supreme court: 'The true distinction, therefore, is between the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and conferring an authority or discretion as to its execution, to be exercised under and in pursuance of the law. The first cannot be done; to the latter no valid objection can be made.'

"Mere matters of detail within the policy and the legal principles and standards established by the statute or ordinance are essentially ministerial rather than legislative. The working out in detail of the policy indicated by the statute may be left to the discretion of administrative officers or tribunals. Where the act sufficiently indicates the legislative purpose,

and merely leaves the administrative details to some agency, it is not subject to the objection that it delegates legislative powers. The method and manner of enforcing a law must necessarily be left to the reasonable discretion of administrative officers." From an annotation in 79 L.Ed. 474 at p. 485, entitled "Delegation of Legislative Power."

5. It is of interest to note that the Constitutional issues presented herein are of first instance throughout the United States, although in the course of the termination of Governmental guardianship over the following five Indian Tribes or nations

Ute Indians, Aug. 27, 1954, 68 Stat. 868.

Paiute Indians, Sept. 1, 1954, 68 Stat. 1099.

Wyandotte Indians, Aug. 1, 1956, 70 Stat. 893.

Ottawa Indians, Aug. 3, 1956, 70 Stat. 963.

Menominee Indians, June 17, 1954, 68 Stat. 251.

Congress has made provision for dealing with those "in need of assistance" in conducting their affairs, similar to § 564n. This situation does show a general acceptance of this legislation as being within the power of Congress.

provision placed in the trust agreement pursuant to the powers of the Secretary to establish a trust, which was not limited by Congress as to terms and provisions and must be treated as a provision deemed by the Secretary to be for the protection and benefit of the beneficiary of the trust.

Therefore, the plaintiff's motion for summary judgment must be denied.

This cause is held by the Court in order to deal with the plaintiff's allegation "at no time, nor at present, was or is plaintiff in need of a guardian or trustee."

Counsel for the defendant is requested to submit a proposed order to implement this opinion.

