Furman CRAIN, Sr., Marian Crain and Tilda Chavez, also known as Mildred Chavez, Appellants,

v.

The FIRST NATIONAL BANK OF OREGON, PORTLAND, a national banking association, and United States of America, Appellees.

No. 18564.

United States Court of Appeals Ninth Circuit.

Nov. 13, 1963.

Kell & Alterman, and Clifford B. Alterman, Portland, Or., and Forrest E. Cooper, Lakeview, Or., for appellants.

Pendergrass, Spackman, Bullivant & Wright, and Charles E. Wright, Portland, Or., for appellee.

Ransey Clark, Asst. Atty. Gen., Roger P. Marquis and S. Billingsley Hill, Attorneys, with the Dept. of Justice, Washington, D. C., and Sidney I. Lezak, U. S. Atty., Portland, Or., for intervenor-appellee.

Before CHAMBERS and BARNES, Circuit Judges, and BEEKS, District Judge.

BEEKS, District Judge.

Appellants are Indians enrolled in the Klamath Tribe. They brought separate actions in the district court against appellee. The First National Bank of Oregon, Portland, for declaratory judgment holding (1) the provisions of the Klamath Termination Act, 25 U.S.C. §§ 564–564x, providing for the placing of funds of Indians determined by the Secretary of the Interior to be in need of assistance in private trusts to be unconstitutional, and (2) the balloting procedure required by Section 564d of that Act was not followed. The United States intervened pursuant to 28 U.S.C. § 2403 and thereafter appellant, Furman Crain, Sr.,

moved for summary judgment.[1] Following the denial of such motion, all three actions were consolidated and a pretrial order was entered in which all of the facts were agreed. Appellants and appellees then moved for summary judgment. The district court granted appellee's motion and entered judgment. This appeal followed.[2]

The district court had jurisdiction under the provisions of 28 U.S.C. § 1331, relating to federal questions, and 28 U.S.C. §§ 2201, 2202, the Federal Declaratory Judgments Act. Jurisdiction is conferred upon this court under the provisions of 28 U.S.C. §§ 1291 and 1294.

Appellants' only assignment of error is that the district court erred in granting appellee's motion for summary judgment and in denying appellants' motion for summary judgment, and hence, in sustaining the constitutionality of the trust provisions of the Klamath Termination Act and the validity of the procedures taken thereunder.

The Klamath Termination Act of August 13, 1954, 68 Stat. 718, as amended August 14, 1957, 71 Stat. 347, 25 U.S.C. §§ 564–564x, provided for termination of federal supervision over the Klamath Indian Tribe.

Under the terms of the Act the tribal roll was closed as of August 13, 1954, and thereafter the Secretary of the Interior, pursuant to the directions of the Act, caused the final tribal roll to be established and published in the Federal Register of November 21, 1957. Each appellant was named as an enrolled member of the Klamath Tribe therein and was thus entitled to a share of the tribal property.

Section 564d(a) (2) of the Act provides that immediately after the Secretary of the Interior approves an appraisal of the tribal properties, each enrolled Indian be given "an opportunity to elect to withdraw from the tribe and have his interest in tribal property converted into money and paid to him, or to remain in the tribe and participate in the tribal management plan" to be prepared under Sec. 564d(a) (5) of the Act. Pursuant to Section 564d(a) (2), appellants were furnished ballots on which to make their election as follows:

"A. I elect to remain in the tribe and have my share of tribal assets placed under a management plan substantially in the form of the plan dated Feb. ..... 1958, of which I have received a summary, which is satisfactory as to form and content."

"B. I elect to withdraw from the tribe and have my share of tribal assets converted into cash."

Each ballot specified that it must be executed and returned by a specified date and that a person failing to make the election would remain in the tribe with his assets placed under the final tribal management plan. Appellants duly elected to withdraw from the tribe.

Section 564n of the Act provides, in part, that prior to the transfer or paying over of the money representing a withdrawing enrollee's interest in the tribal property, "the Secretary shall protect the rights of members of the tribe who are minors, non compos mentis, or in the opinion of the Secretary in need of assistance in conducting their affairs, by causing the appointment of guardians for such members * * * or by such other means as he may deem adequate, without application from the member, including but not limited to the creation of a trust of such member's property with a trustee selected by the Secretary * * *."[3]

---

1. The opinion of the district court is reported at D.C., 206 F.Supp. 783.

2. On June 25, 1963, appellant Tilda Chavez, also known as Mildred Chavez, filed a motion for an order dismissing her appeal and this court granted the motion and so ordered.

3. Title 25 U.S.C. § 564n further provides, in part:
"* * * Provided, however, That no member shall be declared to be in need of assistance in conducting his affairs unless the Secretary determines that such member does not have sufficient ability,

Section 564n further provides, in part, that any member, within 120 days after receipt of notice that the Secretary has made such a determination, may contest it "in any naturalization court for the area in which said member resides" and that "the burden shall thereupon devolve upon the Secretary to show cause why such member should not conduct his own affairs, and the decision of such court shall be final and conclusive with respect to the affected member's conduct of his affairs."

Pursuant to the above provisions, on or about June 10, 1958, the Secretary of the Interior made individual determinations that each of the appellants was in need of assistance in conducting his or her affairs and notified each appellant thereof. None of the appellants contested that determination in any naturalization court.

Following such determinations, the Secretary of the Interior selected appellee, The First National Bank of Oregon, Portland, as trustee to receive and administer appellants' liquidated shares of tribal properties. Identical trust agreements were executed by the Secretary of the Interior and the appellee bank on May 16, 1958, and June 17, 1958, respectively, and the trusts are presently administered by appellee bank.

Finally, on August 12, 1961, the Acting Secretary of the Interior published in the Federal Register, 26 F.R. 7362, a Proclamation declaring a termination of the federal trust relationship pursuant to Section 564q of the Act.

In support of their specification of error, appellants contend:

1. That the provisions of Section 564n of the Act violate the Fifth Amendment to the Constitution of the United States in that they restrict appellants' use of their property solely because of Indian ancestry.

2. That the designation of private trustees for the management of the trust property instead of the Secretary of the Interior is an unconstitutional delegation of Congressional power to a private person.

3. That appellants were not offered the ballot choice required by Section 564d(a) (2) of the Act.

██ With respect to their contention that the trust provisions of Section 564n of the Act violate their Fifth Amendment rights, appellants do not contest the fact that historically the relationship between the United States and the Indian tribes has been one of guardian and ward and that such a relationship is constitutional.[4] Neither do appellants question Congressional power to manage the property of Indians until such time as it releases them from wardship. While the wardship relation itself is undoubtedly based in part upon Indian ancestry, appellants do not challenge it for this reason. They do say, however, that the trust provisions of the Klamath Termination Act are racially discriminatory and in violation of the Fifth Amendment. The thrust of their argument is that once federal jurisdiction terminated on August 13, 1961, by Proclamation of the Secretary of the Interior, the guardian-

knowledge, experience, and judgment to enable him to manage his business affairs, including the administration, use, investment, and disposition of any property turned over to such member and the income and proceeds therefrom, with such reasonable degree of prudence and wisdom as will be apt to prevent him from losing such property or the benefits thereof * * *."

**4.** Numerous authorities recognize this relationship between the United States and the Indians. See, for example, United

States v. Kagama, 118 U.S. 375, 6 S.Ct. 1109, 30 L.Ed. 208 (1885); Tiger v. Western Investment Company, 221 U.S. 286, 31 S.Ct. 578, 55 L.Ed. 738 (1911); United States v. Waller, 243 U.S. 452, 37 S.Ct. 430, 61 L.Ed. 843 (1916); United States v. Nice, 241 U.S. 591, 36 S. Ct. 696, 60 L.Ed. 1192 (1916); Brader v. James, 246 U.S. 88, 38 S.Ct. 285, 62 L.Ed. 591 (1917); Sunderland v. United States, 266 U.S. 226, 45 S.Ct. 64, 69 L. Ed. 259 (1924); and Board of Comm'rs. of Creek Co., Okl. v. Seber, 318 U.S. 705, 63 S.Ct. 920, 87 L.Ed. 1094 (1943).

ward relationship ended for all purposes and appellants' rights to handle their property must be determined as any other person's. Therefore, a determination by the Secretary of the Interior that they are in "need of assistance" and the consequent establishment of private trusts over their property discriminated against them because of their Indian ancestry and is violative of the Fifth Amendment.

Our answer is direct and simple. Federal jurisdiction did not end on August 13, 1961, and the guardianship relation has not terminated for all purposes.

■■■■■ Congress has the power to determine when, how and by what steps it will emancipate the Indian and whether the emanicipation shall be complete or only partial. Tiger v. Western Investment Company, 221 U.S. 286, 31 S.Ct. 578, 55 L.Ed. 738 (1911); United States v. Nice, 241 U.S. 591, 36 S.Ct. 696, 60 L.Ed. 1192 (1916); United States v. Waller, 243 U.S. 452, 37 S.Ct. 430, 61 L.Ed. 843 (1916); Brader v. James, 246 U.S. 88, 38 S.Ct. 285, 62 L.Ed. 591 (1917). This right of the Government, acting through Congress, to exercise continued partial guardianship and to gradually terminate that relationship, was established and set forth fully in the Waller case, supra. The Supreme Court there stated at pages 459–460:

" * * * it is necessary to have in mind certain matters which are well settled by the previous decisions of this court. The tribal Indians are wards of the Government, and as such under its guardianship. It rests with Congress to determine the time and extent of emancipation. Conferring citizenship is not inconsistent with the continuation of such guardianship, for it has been held that even after the Indians have been made citizens the relation of guardian and ward for some purposes may continue. On the other hand, Congress may relieve the Indians from such guardianship and control, in whole or in part, and may, if it sees fit, clothe them with full rights and responsibilities concerning their property or give to them a partial emancipation if it thinks that course better for their protection."

Appellants do not controvert the existence of this power of gradual emancipation but argue that the Proclamation by the Secretary of the Interior on August 13, 1961, pursuant to Section 564q of the Act, was a complete and not a partial or gradual termination, and that it removed all restrictions on all property of all Klamath Indians as of the date it was proclaimed. By this contention appellants seek to obtain benefits under one part of the statute while they deny the whole. By the very terms of Section 564n and by *express exception in the Proclamation*,[5] Indians "in need of assistance in conducting their affairs" were specially treated and the fiduciary management of their property was not terminated but was placed in the hands of private trustees, a method expressly authorized by Congress in Section 564n. Thus, on August 13, 1961, all federal supervision ended and emancipation occurred but only *to the extent of the pro-*

---

5. The Proclamation was as follows:

"1. The Federal restrictions on the property of the Klamath Indian Tribe of Oregon and individual members thereof having been removed, the Federal trust relationship to the affairs of the tribe and its members is terminated, effective August 13, 1961.

"2. Hereafter, individual members of the tribe shall not be entitled to any of the services performed by the United States for Indians because of their status as Indians *and, except as otherwise provided in the Act of August 13, 1954, supra, all statutes of the United States which affect Indians because of their status as Indians shall no longer be applicable to members of the tribe* [emphasis added] and the laws of the several states shall apply to the tribe and its members in the same manner as they apply to other citizens or persons within their jurisdiction.

"3. Nothing in this proclamation shall affect the status of members of the Klamath Tribe as citizens of the United States."

*visions of the entire Act* under which the termination proclamation was made.

■ Moreover, the procedural aspects of the formation and administration of these trusts provide appellants with all procedural rights afforded them by the Constitution. The Secretary's determination that appellants were "in need of assistance" was subject to judicial review pursuant to Section 564n by way of proceedings in the nature of a trial *de novo* with the burden of proof on the Secretary. Appellants did not see fit to avail themselves of this right to contest the Secretary's determination and are thus bound by it. Similarly, the trusts established for appellants were from the moment of creation subject to judicial supervision upon appropriate application by appellants as beneficiaries under the applicable state trust law, here the law of Oregon.[6] Thus, appellants' rights with respect to any arbitrary or unreasonable provision of the trust or action on the part of the trustee are protected

■ There is no unlawful discrimination because of Indian ancestry. Appellants acknowledge that Indian property is subject to, control during wardship. Here, during wardship, their need of assistance was determined by the procedure prescribed by Congress and their property was placed in trust with the prescribed Congressional restrictions as a means of partially continuing wardship. The whole theme of the Klamath Termination Act is the general termination of govenmental guardianship of a tribal society and the recognition of the dignity of the individual and not discrimination against him.

Appellants' second contention is that in the Klamath Termination Act Congress has abdicated its Constitutional power over and duty to the Indians in favor of private corporations in violation of Article I, Section 1 of the Constitution.

■ While Congress cannot delegate to private corporations or anyone else the power to enact laws, it may employ them in an administrative capacity to carry them into effect. Berman v. Parker, 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954). "The true distinction * * * is between the delegation of the power to make the law, which necessarily involves a discretion as to what it shall be, and conferring an authority or discretion as to its execution, to be exercised under and in pursuance of the law. The first cannot be done; to the latter no valid objection can be made." [7]

■ In the Klamath Termination Act, Congress declared distinctly and in considerable detail the objects to be accomplished and its policies and standards with respect to the removal of restrictions from the Indians and their property. Congress designated the Secretary of the Interior as its instrument for the execution and management of the termination,[8] that is, as its administrator, and in addition specifically prescribed alternative methods of carrying out such management, one of which was the creation of private trusts with trustees selected by the Secretary. Thus, Congress exercised its law making power by authorizing termination of restrictions and

---

6. In addition to their general and inherent jurisdiction over trusts and actions to establish or enforce them, courts of equity have the right to exercise a supervisory control over trustees. United States National Bank of Portland v. Guiss, 214 Or. 563, 331 P.2d 865 (1958). Furthermore, although the courts will not interpose their judgment upon the trustee in the exercise of a discretionary power, they will control, or correct an unreasonable or arbitrary exercise of such a power. In re Strome's Estate, 214 Or. 158, 327 P. 2d 414 (1958).

7. From an annotation in 79 L.Ed. 474 at page 485, entitled "Delegation of Legislative Power."

8. Such a designation by Congress was entirely proper. See Board of Com'rs. of Pawnee County, Oklahoma v. United States, 139 F.2d 248 (10th Cir. 1943), cert. den. 321 U.S. 795, 64 S.Ct. 846, 88 L.Ed. 1084. See also Carlson v. Landon, 342 U.S. 524, 72 S.Ct. 525, 96 L.Ed. 547 (1952); United States v. Shreveport Grain and El. Co., 287 U.S. 77, 53 S.Ct. 42, 77 L.Ed. 175 (1932).

setting forth certain required procedures. It delegated to the Secretary only the authority to determine the appropriate method of protecting and managing the property of Indians in need of assistance. The Secretary in the exercise of that judgment selected one of the means actually authorized by Congress. The fact that national banking institutions have had extensive experience in the management and administration of trusts indicates that Congress in providing for the creation of trusts, and the Secretary in choosing such method, acted so as to provide what was in their opinion the best possible protection for the Indians affected.

■ With respect to the terms of the trusts themselves,[9] they clearly embody the policies, objectives and standards of Congress and contain nothing contrary thereto. As was stated by the district court, Article II(c) of each trust, which permits the trustee to terminate part or all of the trust when he finds the beneficiary capable of managing his own property, "is not a delegation of any authority conferred by law upon the Secretary, it is simply a provision placed in the trust agreement pursuant to the powers of the Secretary to establish a trust, which was not limited by Congress as to terms and provisions and must be treated as a provision deemed by the Secretary to be for the protection and benefit of the beneficiary of the trust." [10]

Finally, appellants contend that the ballot submitted to them was not in compliance with the requirements of the Act. Their objection to that portion of the ballot directed to withdrawing members was abandoned during oral argument before this court, but with respect to that portion of the ballot directed to those electing to remain in the tribe, it is appellants' contention that the choice given them required that they waive objections to the tribal management plan submitted to them at that time in order to remain, and that such violated Section 564d(a) (2), which did not require such a waiver.

■ First, the terms of Section 564d (a) (2) did not specifically require that any particular form of ballot be used, nor did they require that a form of plan be submitted to appellants at the time they made their election.[11] Second, the section did not give appellants any absolute right of objection. Although it did indicate that a plan satisfactory to the Secretary and the Indians electing to remain should be sought, it gave the Secretary ultimate authority to adopt a plan whether or not those who elected to remain in the tribe approved. Third, appellants were already members of the tribe so that, technically speaking, the only real

9. Article I(e) of each agreement provided that "it shall be the objective to terminate the trust and place the Beneficiary in full and complete control of the trust assets as soon as his [her] capacity to manage his [her] own financial affairs in a prudent and business like manner is established," and Article II(c), a clause customarily found in spendthrift trusts, provided that "The trustee may terminate this trust, to the extent of any part thereof, at any time it shall, in its sole discretion, find the Beneficiary competent, capable, and willing to manage the properties so affected by the termination, by distributing such properties to the Beneficiary as his [her] sole and separate property free and clear of the trust provisions contained herein."

10. 206 F.Supp. 783 at pp. 789 and 790.

11. Sec. 564d(a) (5) provides that qualified management specialists selected by the Secretary are to: "cause a plan to be prepared in form and content satisfactory to the members who elect to remain in the tribe and to the Secretary for the management of tribal property through a trustee, corporation, or other legal entity. If no plan that is satisfactory both to the members who elect to remain in the tribe and to the Secretary has been prepared six months before the time limit provided in section 564e(b) of this title the Secretary shall adopt a plan for managing the tribal property, subject to the provisions of section 564n of this title." This would suggest that it would have been possible to submit the plan only to those who had elected to remain (had not elected to withdraw) and in such case it would have been necessary for the election to have been made prior to submission of the plan.

election would be made by those who sought to withdraw from the tribe.[12] Continued membership in the tribe necessarily acceded to the Secretary's plan of management. By submitting the form of plan at the same time he submitted the ballot, the Secretary actually went further than the statute required and acquainted appellants with the plan which was to be adopted before they made their election to withdraw from or remain in the tribe.

The judgment is affirmed.

12. This is made clear from the fact that the ballot itself stated that if the Indian did not return the executed ballot he would remain in the tribe and his share of tribal assets would be placed under the final plan of management.