667 F.2d 931
 Evelyn VIGIL, a minor, by Ignacio Vigil, Father and Next
Friend; Theresa Catheryn Abeyta, a minor, by Sefarina
Abeyta, Mother and Next Friend; Sheila Abeyta, a minor, by
Edward Abeyta, Father and Next Friend; Curtis Sandoval, a
minor, by John Sandoval, Father and Next Friend; Shelly
Archuleta, a minor, by Cesarita Archuleta, Mother and Next
Friend; Janice Simbola, a minor, by Nelson Simbola, Father
and Next Friend; John Martinez, a minor, by Pat Martinez,
Father and Next Friend; and Leonard J. De Layo,
Superintendent of Education of
the State of New Mexico, Plaintiffs-Appellants, Kathy
Buurma, a minor, by Clarence Buurma, Father and Next Friend;
Alvera Lester, a minor, by Jerry Lester, Father and Next
Friend; Mike Rocha, a minor, by Clarice Rocha, Mother and
Next Friend; and Mescalero Apache Tribe,
Plaintiffs-Intervenors-Appellants-Intervenors,
v.
The Honorable Cecil B. ANDRUS, Secretary of Interior of the
United States of America; The Honorable Morris P. Thompson,
Commissioner of Indian Affairs of the Bureau of Indian
Affairs of the Department of the Interior; the Honorable
John Knebel, Acting Secretary of Agriculture of the United
States, and W. F. Warren, Regional Director of the
Department of Agriculture of the United States of America,
or their successors in office; The Bureau of Indian Affairs;
the Department of Agriculture; and the Department of
Interior, Defendants-Appellees.
 No. 79-1930.
 United States Court of Appeals,
Tenth Circuit.
 Argued and Submitted Jan. 26, 1981.
Decided Jan. 4, 1982.
 
 L. Lamar Parrish of Ussery, Burciaga & Parrish, Albuquerque, N. M., for plaintiffs-appellants Evelyn Vigil and other minors.
 Robert N. Hilgendorf, Asst. Atty. Gen. of the State of N. M., Santa Fe, N. M., (Jeff Bingaman, Atty. Gen. of the State of New Mexico, Santa Fe, N. M., with him on the brief), for plaintiff-appellant Leonard J. De Layo.
 Kim Jerome Gottschalk, Alamogordo, N. M., (George E. Fettinger, Alamogordo, N. M., with him on the brief), Fettinger & Bloom, Alamogordo, N. M., for plaintiffs-intervenors, appellants-intervenors.
 James C. Kilbourne, Atty., Dept. of Justice, Washington, D. C., (James W. Moorman, Asst. Atty. Gen., Anne S. Almy, Atty., Dept. of Justice, Washington, D. C., R. E. Thompson, U. S. Atty., Ruth C. Streeter, Asst. U. S. Atty., Albuquerque, N. M., with him on the brief), for defendants-appellees.
 Anthony F. Little, Indian Pueblo Legal Services, Inc., Bernalillo, N. M., filed an amicus curiae brief for Santo Domingo Pueblo.
 Before SETH, Chief Judge, and HOLLOWAY and LOGAN, Circuit Judges.
 LOGAN, Circuit Judge.
 
 
 1
 The Mescalero Apache Tribe, several Pueblo and Mescalero Apache school children, and the Superintendent of Education of the State of New Mexico appeal the district court's refusal to enjoin the federal government from discontinuing a program that provided free lunches to all Indian children attending New Mexico public schools. The Bureau of Indian Affairs (BIA) had transferred responsibility for providing free lunches to the United States Department of Agriculture (USDA). Under the USDA's National School Lunch Program, only needy children receive free lunches. The plaintiffs have challenged the transfer of responsibility and the elimination of free lunches for Indian school children not qualifying as needy under USDA guidelines. On appeal the issues are (1) whether, because of either the government's trust obligations to the Indians or the expectation of Congress in making appropriations under the Johnson-O'Malley Act, 25 U.S.C. §§ 452-457, all Indian children attending public schools are entitled to free lunches regardless of need; (2) whether the BIA's transfer of the free lunch program to the USDA and elimination of free lunches for nonneedy Indian school children complied with the Administrative Procedure Act (APA), Ch. 324, §§ 1-12, 60 Stat. 237 (1946) (codified as amended in scattered sections of 5 U.S.C.), and the BIA's own rulemaking procedures; and (3) whether providing free lunches without regard to need to Indian children attending federal day schools, contract schools, and boarding schools, while restricting free lunches for Indian children attending public schools to those who are needy, violates the Snyder Act, 25 U.S.C. § 13, or denies Indians attending public schools their constitutional right to equal protection.
 
 
 2
 For many years the BIA provided free lunches to all Indian school children. If the BIA operated the school, it furnished free lunches directly. If the tribe operated the school or if the children attended public schools, the BIA reimbursed the tribe or the state for the cost of the lunches. To reduce its costs and to make funds available to assist Indians in other ways, the BIA decided to shift the public school portion of its Indian free lunch program to the USDA. However, the USDA provides free lunches only to those children whose families qualify as needy.[1] Therefore the shift would eliminate free lunches for nonneedy Indian children attending public schools. The BIA and USDA planned to phase-in the program over a period of three school years; during that time, if the USDA was told an Indian child qualified as needy, it would pay for the child's lunch, and if the USDA was not so told, the BIA would pay for the lunch. Beginning with the 1973-74 school year, nonneedy Indian children in the public schools would no longer receive free lunches.
 
 
 3
 Neither the BIA nor the USDA held evidentiary hearings or rulemaking proceedings before shifting the program to the USDA and ending the free lunch program for nonneedy Indian children, and neither announced the changes in the Federal Register. The USDA disseminated the only announcement on March 31, 1970, when the Child Nutrition Division (CN) of its Food and Nutrition ServiceS issued FNS(CN) Instruction 784-2 to the CN field offices and state educational agencies. The instruction, which had been developed jointly by the Child Nutrition Division and the BIA, informed the state educational agencies that the USDA would begin paying for lunches to needy Indian school children and that the state agencies were to determine which school children qualified. The instruction stated that the BIA would soon inform its own field offices of the change; however, the record does not contain evidence of any such BIA announcement.
 
 
 4
 According to the record, the government first informed interested Indians of the changes in the free lunch program fourteen months later at a July 8, 1971 meeting held for that purpose in Albuquerque. In attendance were employees of the BIA, the USDA, and the New Mexico Department of Education, and the president of the Mescalero Apache Tribe and other members of the Indian community.
 
 
 5
 Until 1976 the New Mexico public schools apparently certified all Indian school children as eligible under the National Free Lunch Program. When the USDA learned of the blanket certifications, it informed the schools that the family of each Indian school child for whom a free lunch was sought would have to submit financial information annually, and that the USDA would not reimburse the schools for lunches given to Indian children unless the school maintained current financial information showing eligibility.[2] The Indians and the State of New Mexico then brought this suit.I
 
 Whether an Entitlement Existed
 
 6
 The federal government has broad fiduciary obligations to the Indian tribes, Seminole Nation v. United States, 316 U.S. 286, 296-97, 62 S.Ct. 1049, 1054, 86 L.Ed. 1480 (1942), the relationship being akin to guardian and ward, Cherokee Nation v. Georgia, 30 U.S. (5 Pet.) 1, 17-18, 8 L.Ed. 25 (1831); Crain v. First National Bank, 324 F.2d 532, 535 (9th Cir. 1963). But the federal government generally is not obligated to provide particular services or benefits in the absence of a specific provision in a treaty, agreement, executive order, or statute. See Gila River Pima-Maricopa Indian Community v. United States, 427 F.2d 1194, 1198, 190 Ct.Cl. 790, cert. denied, 400 U.S. 819, 91 S.Ct. 37, 27 L.Ed.2d 47 (1970). We agree with the district court that no express provision in any statute or treaty requires the federal government to provide free lunches to all Indian children. While the plaintiffs call attention to many treaties that refer to educating Indian peoples, they have not pointed to any provision specifically encompassing school lunches.
 
 
 7
 The applicable language of the Snyder Act, the BIA's general authorization to spend money appropriated by Congress, states only that the BIA may spend "for the benefit, care, and assistance of the Indians throughout the United States for the following purposes: General support and civilization, including education." 25 U.S.C. § 13. The Johnson-O'Malley Act, as applicable, authorizes contracts with states or schools "for the education" of Indians, and expenditures under those contracts of "moneys appropriated by Congress for the education ... of Indians in such State or Territory." 25 U.S.C. § 452. The language of each of these Acts is too broad to support a conclusion that Congress has expressly appropriated funds for lunches for all Indian school children.
 
 
 8
 Plaintiffs argue that Congress was aware of the BIA's long-standing free lunch program and believed it was appropriating funds to support that program. Relying on Morton v. Ruiz, 415 U.S. 199, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974), they argue that this congressional expectation gave specific meaning to the government's trust responsibilities and created an Indian entitlement to continuation of the program.
 
 
 9
 In Ruiz a unanimous Supreme Court held that Indians who lived near a reservation were entitled to general assistance benefits despite longstanding BIA regulations that expressly limited the benefits to those who lived on a reservation. The Court relied heavily on the BIA's practice of including in its "service area" Indians living near the reservations, and the BIA's many representations to Congress that it would use appropriation funds for the benefit of Indians living near the reservations as well as on the reservations. The Court held that in appropriating funds for the BIA, Congress must have expected that Indians living near a reservation would receive benefits.
 
 
 10
 While the evidence regarding Congress's expectation is not as extensive as that recited in Ruiz, showing Congress's expectation regarding general assistance benefits for Indians living near a reservation, the legislative history contains some evidence that Congress knew the BIA was providing free lunches to all Indian school children. See Department of Interior and Related Agencies Appropriations for 1969: Hearings before a Subcomm. of the Comm. on Appropriations, 90th Cong., 2d Sess. 628-632 (1968). Additionally, Congress probably knew of the program since, until the shift to the USDA, the Indian free lunch program consumed nearly 25% of Johnson-O'Malley Act appropriations. There is also evidence that in 1969 Congress was aware the BIA was contemplating a shift of the free lunch program to the USDA. In its report to Congress, the Senate Special Subcommittee on Indian Education expressed concern about the nutritional needs of Indian children and made the following recommendation regarding whether the BIA should reduce its school lunch program and transfer responsibility for the program to the USDA:
 
 
 11
 "(e) That the Bureau of Indian Affairs not reduce the school lunch program provided with Johnson-O'Malley funds unless it assures that every student who would receive a lunch under Johnson-O'Malley will receive a school lunch under some other program.
 
 
 12
 "Almost 25 percent of Johnson-O'Malley expenditures are currently for school lunches for Indian students. The Bureau of Indian Affairs has indicated its interest in terminating this use of Johnson-O'Malley funds and having the Department of Agriculture take over this function. The Bureau's JOM lunch program should not be reduced unless assurances are made that Indian students who would receive lunches under JOM will receive them under some other program."
 
 
 13
 S.Rep.No. 91-501, 91st Cong., 1st Sess. at 112-113 (1969) (emphasis added). The government counters that at another point the report recommends that lunches "should always be available to those Indians who cannot afford to pay," id. at 113 (emphasis added); and therefore any entitlement arising by virtue of congressional expectation would be limited to needy Indians. The report is not entirely clear, but we think it stands for subcommittee concern that all Indian school children receive free lunches regardless of their ability to pay.
 
 
 14
 We conclude that Congress was aware of the BIA's school lunch program. At least its Subcommittee on Indian Education believed that all Indian school children should receive free lunches, even if the BIA were to shift responsibility to the USDA. Apparently Congress also expressed an interest in shifting the program to another agency. According to FNS(CN) Instruction 784-2, several congressional committees asked the BIA to determine whether other programs could be used to meet the nutritional needs of Indian school children. In view of Congress's knowledge of the BIA lunch program and Congress's apparent desire to shift funding of the school lunch program to another agency, we are unwilling to find an Indian entitlement that would prohibit the BIA from either shifting responsibility or eliminating free lunches for nonneedy Indian children in public schools. But we think the status of the free lunch program was such that the BIA could not change it without invoking the rulemaking and publication requirements discussed in Ruiz.
 
 II
 
 15
 APA and BIA Rulemaking and Publication Requirements
 
 
 16
 The trial court found the BIA's alteration in the Indian school lunch program fell within the "contracts" exception to the notice-and-comment provisions for rulemaking because the change involved the BIA's contracts to reimburse state school agencies. See 5 U.S.C. § 553(a)(2). The trial court also found that the BIA's change in the Indian school lunch program was a "statement of general policy" and therefore subject to the APA's publication requirement. See 5 U.S.C. § 552(a)(1)(D). Although the BIA did not publish, the trial court found that the change was valid as regards these plaintiffs because they had "actual and timely notice" before they were "adversely affected." See 5 U.S.C. § 552(a)(1).
 
 A. Rulemaking
 
 17
 While the government brief addresses only contracts, it relies upon the "grants, benefits, or contracts" exceptions to the rulemaking provisions of the APA. 5 U.S.C. § 553(a)(2).[3] The exceptions for grants and benefits have been justified on the ground that the recipients have no "right" to the grants or benefits: If the government wishes to impose restrictions, the recipients can avoid the restrictions by not accepting the grant or benefit; and if the government wishes to terminate the grant or benefit, the recipient had no right to it and thus is not entitled to a voice in whether it is terminated. See Bonfield, Public Participation in Federal Rulemaking Relating to Public Property, Loans, Grants, Benefits, or Contracts, 118 U.Pa.L.Rev. 540, 572-73 (1970) (hereafter "Bonfield"). The exception for government contracts can be justified on the same ground: The recipient has no "right" to the contract; therefore the government can terminate the contract as it sees fit, and the recipient can avoid contract restrictions simply by not entering into the contract. The "contracts" exception is also justified on the ground that the government enters into contracts in its proprietary capacity, and private parties have no right to participate in the government's conduct of its own business affairs. See id.
 
 
 18
 We do not agree with the trial court that the free school lunch program is within the "contracts" exception. The APA's legislative history states that these exceptions apply only to the extent the exception is "clearly and directly involved."[4] These contracts were only an incidental means to the end of providing free lunches to all Indian school children. The direct effect of the policy change fell upon the Indian school children and their families.
 
 
 19
 Either the "grants" or "benefits" exception seems more appropriate. Analogous changes have been held to be within either or both of these exceptions. See Good Samaritan Hosp. v. Mathews, 609 F.2d 949, 953-54 (9th Cir. 1979) (change in medicare reimbursement); Humana of South Carolina, Inc. v. Califano, 590 F.2d 1070, 1083 (D.C.Cir.1978) (same); Rodway v. USDA, 514 F.2d 809, 813 (D.C.Cir.1975) (change in food stamp regulations). Nevertheless, we do not think the exceptions for grants and benefits apply to this case. First, while the federal government does not have a recognized fiduciary relationship with the poor, the government has assumed almost a guardian-ward relationship with the Indians by its treaties with the various tribes and its assumption of control over their property. This suggests that the withdrawal of benefits from Indians merits special consideration. Second, Ruiz specifically focused on the BIA's duty to be fair in informing the Indians of changes in eligibility requirements for general assistance benefits, but the case may be read more broadly to require the BIA to follow rulemaking procedures whenever it cuts back congressionally created and funded programs for Indians. Ruiz states:
 
 
 20
 "This agency power to make rules that affect substantial individual rights and obligations carries with it the responsibility not only to remain consistent with the government legislation, ... but also to employ procedures that conform to the law.... No matter how rational or consistent with congressional intent a particular decision might be, the determination of eligibility cannot be made on an ad hoc basis by the dispenser of the funds.
 
 
 21
 "The Administrative Procedure Act was adopted to provide, inter alia, that administrative policies affecting individual rights and obligations be promulgated pursuant to certain stated procedures so as to avoid the inherently arbitrary nature of unpublished ad hoc determinations."
 
 
 22
 415 U.S. at 232, 94 S.Ct. at 1073 (citations omitted). It later states:
 
 
 23
 "(I)t is essential that the legitimate expectation of these needy Indians not be extinguished by what amounts to an unpublished ad hoc determination of the agency that was not promulgated in accordance with its own procedures, to say nothing of those of the Administrative Procedure Act. The denial of benefits to these respondents under such circumstances is inconsistent with 'the distinctive obligation of trust incumbent upon the Government in its dealings with these dependent and sometimes exploited people.' Seminole Nation v. United States, 316 U.S., at 296 (62 S.Ct., at 1054); see Squire v. Capoeman, 351 U.S. 1 (76 S.Ct. 611, 100 L.Ed. 883) (1956)."
 
 
 24
 Id. at 236, 94 S.Ct. at 1075.
 
 
 25
 Third, the exceptions for grants, benefits, and contracts have met substantial criticism and we believe they should be narrowly construed.[5] In 1970 the Administrative Conference of the United States recommended that governmental agencies agree to follow rulemaking procedures even if the subject matter would fall within the APA's exceptions for grants, benefits, and contracts. See Rodway v. USDA, 514 F.2d 809, 814 (D.C.Cir.1975). Many agencies adopted this recommendation as an agency requirement. See, e.g., 29 C.F.R. § 2.7 (1981) (Department of Labor); 36 Fed.Reg. 13,804 (1971) (Department of Agriculture); 36 Fed.Reg. 2,532 (1971) (Department of Health, Education and Welfare). Of special significance to this case is that on May 14, 1971, the Department of the Interior adopted the same requirement for it and its agencies, including the BIA, to follow in their subsequent actions. 36 Fed.Reg. 8,336 (1971). By adopting this requirement, the Department of the Interior has expressly recognized that the advantages of public participation in policy decisions affecting public benefits outweigh the disadvantages. This buttresses our conclusion that the exceptions do not apply here.
 
 
 26
 The Interior Department's adoption of an additional internal rulemaking requirement requires us to assess whether the BIA policy change occurred after May 14, 1971. The government argues that it was not subject to the new requirement because the BIA and the USDA reached their understanding by the March 31, 1970 issuance date of FNS(CN) Instruction 784-2. However, the record does not show that the government published or officially announced the change at that time. The effective date for eliminating free lunches for "nonneedy" Indians was to be three years later, and the people most affected, the Indians, were not notified until at least July 8, 1971, which is after the date the Department of Interior had agreed to comply with APA rulemaking procedures even for changes in contracts, grants, or benefits. The BIA never issued a formal announcement of the policy change either before or after May 14, 1971; further, its memorandum of a September 2, 1971 meeting with Indian leaders refers to the withdrawal of BIA funding as "proposed" (Pl. Ex. 4). Because the policy change was not going to affect the Indians until 1973, and because the BIA did not announce the change or notify the Indians until after May 14, 1971, we think the BIA cannot rely on a "semisecret," and perhaps tentative, understanding reached months earlier. Therefore, the BIA was obligated to comply with the rulemaking procedures it had in effect beginning May 14, 1971.
 
 B. Publication
 
 27
 The publication requirement is found in section 3 of the APA, the Freedom of Information Act (FOIA) section (5 U.S.C. § 552). The basic purpose of the FOIA is "to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." NLRB v. Robbins Tire & Rubber Co., 437 U.S. 214, 242, 98 S.Ct. 2311, 2327, 57 L.Ed.2d 159 (1978). Because the purpose of publication is to inform the public, the FOIA provides that actual notice to the public is an acceptable alternative. See 5 U.S.C. § 552(a)(1). If a substantive rule or general policy is not published, parties without actual notice cannot be adversely affected by it. Id.
 
 
 28
 The changes involved in this case have an adverse effect that is significant, both qualitatively and quantitatively. The Indian school lunch program involved annual expenditures of approximately $5,000,000. The record's only nationwide enrollment figures, for 1975, show a total of 334,495 Indian students. Report on Indian Education: Final Report to the American Indian Policy Review Comm'n 145 (1976).[6] The only New Mexico figures given, for 1978, show 6,888 Indian school children in public schools, of whom the BIA estimated 85% would be eligible for free or reduced-cost lunches under the USDA's program; in New Mexico alone, the BIA's decision to shift the Indian school lunch program to the USDA could be expected to eliminate benefits for nearly 1,000 Indian school children, reduce the benefits for others, and require all families that wanted to qualify as "needy" to complete annual financial statements.
 
 
 29
 Nothing in the record shows that BIA discussions with a few Indian leaders in July 1971 of the shift in the lunch program to the USDA that began in March 1970 were either actual or timely notice to the families of the Indian children who are plaintiffs in this action or to the much greater number of Indian families affected by the policy change. See Yassini v. Crosland, 618 F.2d 1356, 1362 (9th Cir. 1980) (suggesting that the notice Congress had in mind would be contemporaneous with adoption of the policy); Anderson v. Butz, 550 F.2d 459, 463 (9th Cir. 1977) (same).[7] Therefore, we find the BIA's policy changes invalid for want of publication. If the BIA wishes to eliminate nonneedy Indian school children from the free lunch program, it must comply with its current rulemaking procedures, which do not recognize the grants, benefits, and contracts exceptions. It must give the Indian families notice and the opportunity to comment on the proposed changes.
 
 III
 Conclusion
 
 30
 This case involves somewhat unique juxtapositions of notice and procedures. No notice was ever given in the Federal Register; no actual notice, so far as the record shows, was given to any significant number of the affected Indians until after the agency had bound itself to utilize rulemaking procedures that would permit comment by the affected Indians before the changes become final. In this context the government's arguments that it is within exceptions to both the publication and rulemaking requirements of the APA are not persuasive.
 
 
 31
 In the analogous situation in Ruiz, a unanimous Supreme Court declared that when depriving the Indians of benefits that have long been provided them, the government must "bend over backwards" to assure fair treatment. In particular the Court said, "The overriding duty of our Federal Government to deal fairly with Indians wherever located has been recognized by this Court on many occasions." 415 U.S. at 236, 94 S.Ct. at 1075. The Court disapproved an "unpublished ad hoc determination" by the BIA that expected benefits would be abolished, and said, "The denial of benefits to these respondents under such circumstances is inconsistent with 'the distinctive obligation of trust incumbent upon the Government in its dealings with these dependent and sometimes exploited people.' " Id. (quoting from Seminole Nation v. United States, 316 U.S. 286, 296, 62 S.Ct. 1049, 1054, 86 L.Ed. 1480 (1942)).
 
 
 32
 We hold that the BIA acted improperly in failing to follow APA rulemaking procedures before adopting changes affecting large numbers of Indian families; as a result, those changes are invalid. We need not reach plaintiffs' constitutional arguments. See Ruiz, 415 U.S. at 238, 94 S.Ct. at 1076.
 
 
 33
 The order of the trial court refusing to enjoin the BIA from transferring responsibility for the free lunch program to the USDA and from discontinuing free lunches for Indian school children not meeting the USDA eligibility criteria is hereby
 
 
 34
 REVERSED.
 
 
 
 [1]
 Under the National School Lunch Act, 42 U.S.C. §§ 1751-1769a, the USDA provides a free or reduced price lunch to children whose families meet the income requirements, which vary by family size. For the 1970-71 school year, a family of four did not qualify for free school lunches unless its annual income was no more than $3720, or for reduced price lunches unless its annual income was no more than $4600
 
 
 [2]
 The families were required to complete forms stating why they could not pay for the school lunch, the names of other children in the family and the schools they were attending, names of the family's other dependents, the occupation and employer of both mother and father, an approximation of the family's annual income, and sources of income other than wages. The parents were required to give the school permission to verify the information
 
 
 [3]
 Another exception exempts a "statement of general policy" from section 553's notice and comment provisions. See 5 U.S.C. § 553(b)(A). Plaintiffs contend that the reduction in the Indian school lunch program was not a "statement of general policy." Relying primarily on Noel v. Chapman, 508 F.2d 1023, 1030 (2d Cir.), cert. denied, 423 U.S. 824, 96 S.Ct. 37, 46 L.Ed.2d 40 (1975), and Texaco, Inc. v. FPC, 412 F.2d 740, 744 (3d Cir. 1969), they distinguish between statements intended to guide the actions of agency members and those with substantial impact on the rights of those subject to the agency's regulations, with the former being exempt but not the latter. While the government has not relied on the "statement of general policy" exception, in view of our holding herein, we would not find it applicable
 
 
 [4]
 See S.Rep.No. 752, 79th Cong., 1st Sess. 13 (1945); H.Rep.No. 1980, 79th Cong., 2d Sess. 23 (1946). A typical case involving the "contracts" exception is Crown Zellerbach Corp. v. Marshall, 441 F.Supp. 1110 (E.D.La.1977), in which the challenged regulation required companies, as a precondition to obtaining a government contract, to submit a program for compliance with nondiscrimination requirements. Housing Authority of Omaha v. United States Housing Authority, 468 F.2d 1 (8th Cir. 1972), cert. denied, 410 U.S. 927, 93 S.Ct. 1360, 35 L.Ed.2d 588 (1973), upholding a policy change on the basis of the contracts exception, appears similar to the instant case in that it too involved contracts to provide benefits for third parties. There, however, the federal government's regulations added new conditions to the government's contracts with local housing authorities. Those conditions gave additional rights to the residents of housing projects subsidized by the federal government. By contrast to the BIA's policy changes, the regulations were intended to directly affect the conduct of the housing authorities, the parties at the other end of the government's contracts
 
 
 [5]
 This conclusion finds support in the APA's legislative history. See note 4 supra. Also, the D.C. Circuit, the circuit that most frequently reviews administrative actions, has observed that agencies utilizing the exception ignore the salutary effect that would result from public participation. See New Jersey v. EPA, 626 F.2d 1038, 1045 (D.C.Cir.1980) (exceptions to be "reluctantly countenanced"); Humana of South Carolina, Inc. v. Califano, 590 F.2d 1070, 1082 (D.C.Cir.1978) ("wisdom of public input (is) manifest"); National Wildlife Fed'n v. Snow, 561 F.2d 227, 231 (D.C.Cir.1976) (exceptions "create a serious gap in the procedural protections the APA was enacted to provide"). Commentators have described these exceptions as too broad. See K. Davis, Administrative Law Treatise § 6.30 (2d ed. 1978); Bonfield at 570-83
 
 
 [6]
 This figure is not broken down into Indian children attending public schools and those attending nonpublic schools. However, on page 8 of that report, using a figure of 337,000 school age children, it states that 278,000 attend public schools
 
 
 [7]
 In cases finding adequate notice to the affected parties after adoption of the policy, only a few parties were subject to the policy change. Whelan v. Brinegar, 538 F.2d 924, 925 (2d Cir. 1976) (salary calculations applied only to officers and crew of the Governor's Island Ferry); Nason v. Kennebec County CETA, 646 F.2d 10, 19 (1st Cir. 1981) (ban on political involvement applied only to a single county CETA group); Kessler v. FCC, 326 F.2d 673, 678 (D.C.Cir.1963) (ban on acceptance of applications for radio broadcast stations); United States v. Aarons, 310 F.2d 341, 343 (2d Cir. 1962) (temporary ban on traffic in nuclear submarine launching area)