**GROS VENTRE TRIBE, Assinboine Tribe, and the Fort Belknap Indian Community Council, Plaintiffs,**

v.

**UNITED STATES of America; Bureau of Land Management, an agency of the U.S. Department of Interior; Bureau of Indian Affairs, an agency of the U.S. Department of Interior; and Indian Health Service, an agency of the U.S. Department of Health and Human Services, Defendants.**

**No. CV 00–69–M–DWM.**

United States District Court,
D. Montana,
Missoula Division.

Oct. 22, 2004.

Michael Axline, Eugene, OR, Robert T. Coulter, Andrew Huff, Helena, MT, Amy R. Atwood, for Plaintiffs.

Lori Caramanian, U.S. Department of Justice, Denver, CO, Silas DeRoma, U.S. Department of Justice, Washington, DC, for Defendants.

## ORDER

### I. Introduction

On July 12, 2004, Plaintiffs made a timely motion pursuant to Fed. Rule Civ. P. 59(e) to alter or amend the Court's June 29, 2004 Order granting summary judgment to the BLM. Amendment or alteration is appropriate under Rule 59(e) if (1) the district court is presented with newly discovered evidence, (2) the district court committed clear error or made an initial decision that was manifestly unjust, or (3) there is an intervening change in controlling law. *School Dist. No. 1J, Multnomah County v. ACandS, Inc.,* 5 F.3d 1255, 1263 (9th Cir.1993).

Plaintiffs' motion is premised on the second criterion, clear error or manifest injustice. They contend they were never given an opportunity to brief the issue of remedies, the lack of which was held to be fatal to their claim, and that the Court's Order is inconsistent with its 2001 Order denying the government's motion to dismiss. They ask that the Court vacate its judgment and either deny the government's motion for summary judgment and grant Plaintiffs' motion for summary judgment as to liability, or allow Plaintiffs to brief the issue of remedies. The Tribes contend that the Court's finding of "the lack of an effective remedy for any wrongs committed on the Tribes" in the absence of briefing on that particular issue is fundamentally unfair. They argue that declaratory relief would "clarify the legal obligations of federal agencies to tribal governments in federal decisions which affect tribal interests and rights," and that the Court could order the government to, among other things, build a water treatment system at the headwaters of King Creek. They cite to the earlier ruling on the motion to dismiss as well as a ruling denying the government's motion for a protective order, both of which stated that the Tribes' trust claims were distinct from their APA claims, and could not be treated as typical administrative record-review cases.

The government argues in opposition that the Plaintiffs have failed to meet any of the criteria for amending a judgment; that the Court's order is properly interpreted as finding that the Plaintiffs lacked standing due to lack of redressability; that the Court was correct in holding that the breach of trust claim must be reviewed under the APA; that Plaintiffs had ample opportunity to brief the issue of standing, even though the arguments were not denominated as such; and that Court is required to examine its jurisdiction *sua sponte* at every stage of the proceedings. The government also points out that the court is free to reconsider any of its previous rulings. "Concerns of justiciability go to the power of the federal courts to entertain disputes, and to the wisdom of their doing so." *Renne v. Geary,* 501 U.S. 312, 316, 111 S.Ct. 2331, 115 L.Ed.2d 288 (1991).

In November 2001, this Court denied the government's motion to dismiss on the grounds that the Tribes had stated a cognizable common-law breach of trust claim. It understood the Tribes' claim to be a common-law claim separate from the APA, thereby not requiring an identifiable final agency action subject to a statute of limitations defense. It has reconsidered that ruling *sua sponte,* and held implicitly in its June 29 Order and judgment that a common-law breach of trust claim must, as a jurisdictional matter, be analyzed within the framework of the APA. Within that framework, the Tribes' claims fail on a number of grounds.

The briefs on this motion suggest that the Court's June 29 decision was not as clear as it could have been in its analysis and discussion of the Tribes' claims. The Court will deny the motion to amend, but

will take this opportunity to clarify its reasoning.

## II. Factual Background

The Zortman and Landusky Mines are in the Little Rocky Mountains, on a mix of private and federal land. The Little Rockies were once wholly within the boundaries of the Fort Belknap Reservation, but were ceded to the federal government by the Tribes in the late 1800s. The mines are surrounded on three sides by the Fort Belknap Reservation, but are not on the reservation. Some of the creeks flowing from the Little Rockies flow onto the reservation.

Zortman and Landusky were originally permitted in 1979 by the Montana Department of State Lands. Both mines used cyanide heap-leach processing of gold. In 1979, mining operations undertaken on public lands pursuant to the General Mining Law of 1872, 30 U.S.C. § 22 *et seq.*, did not require any review or approval from the BLM. Nonetheless, BLM commented on the Draft Environmental Impact Statement (DEIS) in a letter dated March 19, 1979. Regarding surface water quality, the BLM stated, "Our studies indicate high concentration of arsenic flowing from the Gold Bug Adit present at Montana Gulch Campground." Regarding groundwater quality, the BLM stated, "The water discharged from the Gold Bug Adit, with its high concentration of arsenic, has an extremely negative impact on the Montana Gulch campground and all landowners downstream from the mining area." In February 1993, the Montana Department of State Lands first disclosed that the mines were leaching acid rock drainage (ARD).

BLM became involved in the approval of mining operations at Zortman and Landusky in 1981—when its surface management regulations became effective—for those portions of the two projects that were on BLM-administered lands. 45 Fed.Reg. 78902 (Nov. 26, 1980) (adopting first set of regulations at 43 C.F.R. Part 3809). In 1981, the State and BLM entered into a Memorandum of Understanding (MOU) to address "cooperative procedures for mines that were in existence prior to the effective date of the 43 CFR 3809 regulations." In 1984, the State and BLM entered into an MOU to address "the administration of plans of operations filed after the effective date of the regulations and involving greater than 5 acres of surface disturbance pursuant to 43 CFR 3809.1."

After granting the initial permits to ZMI, the State, acting through the DSL and its successor the Montana Department of Environmental Quality (MDEQ), granted a number of amendments to the permits for both mines.

BLM approved modifications to the operating permit in March 1994, but deferred further approval on expansion pending completion of an EIS. Following preparation of the EIS, BLM approved additional permits for expansion and reclamation plans in 1996; however, the Interior Board of Land Appeals (IBLA) vacated the decision. *Island Mountain Protectors, National Wildlife Federation, Assiniboine and Gros Ventre Tribes, & Fort Belknap Community Council,* IBLA 97–76, 97–77, 97–85 (May 29, 1988). The IBLA decision was never appealed, Pegasus declared bankruptcy in 1998, and the proposed expansion never took place.

The mines closed in 1998. They are now jointly operated, and being reclaimed, by BLM and the Montana Department of Environmental Quality (DEQ). BLM and Montana DEQ released a Supplemental EIS to the 1996 EIS in 2002, examining six reclamation alternatives for each mine. 67 Fed.Reg. 7191–01 (Feb. 15, 2002). BLM subsequently issued a Record of Decision adopting the preferred alternatives.

Plaintiffs have appealed that decision to the IBLA. Those reclamation plans are not part of Plaintiffs' lawsuit herein.

The Tribes allege in their Complaint that past and ongoing impacts of the mines have adversely affected tribal lands and resources, in violation of the federal government's trust responsibility to the Tribes and the Federal Land and Policy Management Act (FLPMA), 43 U.S.C. § 1732(b); 43 C.F.R. § 3809. They seek declaratory relief regarding these violations, a writ of mandamus compelling reclamation of the mine sites, and an injunction. They do not seek money damages.

### III. Analysis

### A. Subject Matter Jurisdiction: APA Requirements

■ Jurisdiction over any suit against the government requires a clear waiver of sovereign immunity by the United States. *United States v. Mitchell,* 445 U.S. 535, 538–539, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980) (*Mitchell I*). Additionally, it requires a claim falling within the terms of the waiver. *United States v. Mitchell,* 463 U.S. 206, 216–217, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983) (*Mitchell II*). The terms of the government's consent to be sued must be "unequivocally expressed." *Mitchell I,* 445 U.S. at 538, 100 S.Ct. 1349. This is true even when Indian tribes are suing the government for breach of its trust responsibilities. *United States v. White Mountain Apache Tribe,* 537 U.S. 465, 472, 123 S.Ct. 1126, 155 L.Ed.2d 40 (2003).

When a plaintiff sues the government for damages, the waiver may be found in a statute such as the Tucker Act, 28 U.S.C. § 1491, the Indian Tucker Act, 28 U.S.C. § 1505, or the Federal Tort Claims Act, 28 U.S.C. § 2671. When a plaintiff sues the government for equitable relief, waiver may be found in the Administrative Procedures Act. 5 U.S.C. § 702.[1]

■ The Tribes agree that the government's waiver of sovereign immunity for this lawsuit is found in the APA, and that the APA waives sovereign immunity for the common-law trust claim as well as for the FLPMA claim. They also contend, and this Court initially agreed, that although the APA supplies the waiver of sovereign immunity for the common-law trust claim, all other requirements of that statute do *not* apply. Because this issue goes directly to the Court's jurisdiction, it must be considered at every stage of the proceedings.

According to the plain language of the APA, the Court has jurisdiction only over "[a]gency action made reviewable by statute" and "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. Because the actions complained of by the Tribes are not reviewable under a particular statute, the Court's jurisdiction must rest upon the challenged action being a "final agency action." This is true whether the claim challenges an action taken by an agency or a failure to take a specific act. *Norton v. Southern Utah Wilderness Alliance (SUWA),* — U.S. ——, 124 S.Ct. 2373, 159 L.Ed.2d 137 (2004). The question presented is whether the final agency action requirement applies to a "common-law trust" claim.

---

**1.** "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party." 5 U.S.C. § 702.

The Court recognizes that the federal government has an enforceable fiduciary duty toward the Tribes, and that the Tribes may bring a claim against the government for mismanaging tribal property. Here, however, the claim is for mismanaging property *adjacent to* tribal property. As noted in this Court's 2001 decision, such a claim bears more resemblance to nuisance and trespass than to an APA claim. A nuisance/trespass claim may seek damages or injunctive relief; here, the Tribes seek only injunctive relief.

For jurisdictional purposes, the nature of the relief sought determines the source of the sovereign immunity waiver. The hypothetical nuisance case seeking injunctive relief would still require waiver of sovereign immunity, as would the same case seeking money damages. Regardless, the source of the waiver determines the necessary prerequisites to the Court's jurisdiction. Regardless of whether the Tribes *could* have pled a cognizable claim seeking damages, they did not.

Thus, because the APA waives the government's sovereign immunity, the APA establishes the necessary prerequisites to the court's jurisdiction. "[T]he terms of [the government's] consent to be sued in any court define that court's jurisdiction to entertain the suit." *United States v. Sherwood*, 312 U.S. 584, 586, 61 S.Ct. 767, 85 L.Ed. 1058 (1941). Judicial review under § 702 is expressly conditioned, under § 704, on the existence of a "final" agency action. In determining whether an agency action is final, "[t]he core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." *Franklin v. Massachusetts*, 505 U.S. 788, 797, 112 S.Ct. 2767, 120 L.Ed.2d 636, (1992).

This is not a case where the government has not taken a final action; every permit, every environmental impact statement, every Record of Decision is a final agency action. Nonetheless, particular actions being challenged by the Tribes must be identified for this Court to have jurisdiction over the Tribes' claims.[2] Moreover, once final agency actions are identified, the government may assert (as it has) statute of limitations defenses.

## B. The Trust Obligation: Applying the Law

Judicial review under the APA requires finding law to apply. *Heckler v. Chaney*, 470 U.S. 821, 834–835, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985). The Tribes claim the law to be applied is the government's trust obligation. However, the Court cannot find any cases in which that obligation has been applied outside the framework of another law.

■ In the absence of a specific duty, or specific control over tribal property, the government fulfills its obligations as a trustee for the Tribes if it complies with applicable statutes. *Morongo Band of Mission Indians v. F.A.A.*, 161 F.3d 569, 574 (9th Cir.1998). The Tribes disagree with this rule; however, it is the law of this Circuit and I am bound to follow it.

I have read Professor Mary Christina Wood's law review articles discussing the government's trust obligation to Indians, as well as many of the cases that she cites. *See, e.g.*, Mary Christina Wood, *Indian Land and the Promise of Native Sovereignty: The Trust Doctrine Revisited*, 1994 UTAH L.REV. 1471; Mary Christina Wood, *The Indian Trust Responsibility: Protecting Tribal Lands and Resources Through Claims of Injunctive Relief*

---

**2.** This is as true for Plaintiffs' failure-to-act claim under FLPMA as it is for their common-law trust claim. *Norton v. SUWA*, —— U.S. ——, 124 S.Ct. 2373, 159 L.Ed.2d 137 (2004).

*Against Federal Agencies,* 39 Tulsa L.R. 355 (Winter 2003). Nowhere do I find judicial support for the notion that the trust obligation can be enforced independently of some other source of law.

For instance, in *Blue Legs v. Bureau of Indian Affairs,* 867 F.2d 1094 (8th Cir. 1989), individual tribal members sued the Bureau of Indian Affairs (BIA) and the Indian Health Service (IHS), as well as their own tribe, to force cleanup of several dumps on reservation land. The district court held, and the Eight Circuit affirmed, that all three defendants were liable for cleaning up the dumps under the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6901 *et seq.* The Eighth Circuit then held that the statutory duties of the BIA and IHS were *"buttressed* by the existence of the general trust relationship between these agencies and the Tribe." *Id.* at 1100 (emphasis added).

Similarly, the Ninth Circuit articulated a relevant rule regarding the trust obligation in *Morongo Band.* 161 F.3d at 574. The Court looked at *Mitchell I* and *Mitchell II* and concluded that the Supreme Court's holdings regarding the government's trust responsibility arose from specific statutes and regulations imposing particular duties on the government, as well the important fact in *Mitchell II* that the government had "assume[d] such elaborate control over forests and property belonging to Indians." *Id.* (quoting *Mitchell II,* 463 U.S. at 225, 103 S.Ct. 2961). It held that unless a specific duty to act is imposed upon the government, its trust obligation to the tribes is fulfilled by complying with applicable statutes.

Here, the BLM's control has been exercised over non-tribal land. Even if the Court assumes the truth of Plaintiffs' allegation that those non-reservation activities have affected tribal property, the trust obligation is not elevated to an independent source of law.

Plaintiffs cite a statement from *Northern Cheyenne v. Hodel,* 32 I.L.R. 3065 (D.Mont.1985), in which the court said, "a federal agency's trust obligation to a tribe extends to actions it takes off a reservation which uniquely impact tribal members or property on a reservation." *Id.* at 3071. *Northern Cheyenne* involved the sale of coal leases by the BLM. The district court held that the government violated NEPA, 42 U.S.C. § 4321 *et seq.,* as well as the Federal Coal Leasing Amendments, 30 U.S.C. § 201, and that it failed to fulfill its trust obligations to the Tribe. *See Northern Cheyenne v. Lujan,* 804 F.Supp. 1281, 1285 (D.Mont.1991). The BLM had sold the leases without considering the impacts of the sale on the adjacent tribe. There is no indication that the *Northern Cheyenne* court relied on the trust obligation outside the context of other applicable laws. Moreover, the remedies in *Northern Cheyenne*—an order to prepare a supplemental EIS that considered the impacts on the tribe, an order directing the Secretary to follow his own regulations, which required consulting with the tribe—reflect the underlying laws that were violated, i.e., NEPA and the BLM regulations under the FCLA. Here, the government contends that it has fulfilled its trust obligations through the SEIS process. The Plaintiffs dispute that contention—but that dispute is not properly before this Court.

The only statute under which the Tribes challenge the BLM here is the Federal Land and Policy Management Act (FLPMA), 43 U.S.C. § 1701 *et seq.* That challenge is brought under APA § 706(1) for failure to act to prevent undue degradation of tribal lands by failing to adhere to NEPA and the National Historic Preservation Act (NHPA). The requirements for "failure-to-act" claims have recently been clarified by the United States Supreme Court. *Norton v. Southern Utah Wilderness Alliance (SUWA),* 542 U.S.

——, 124 S.Ct. 2373, 159 L.Ed.2d 137 (2004). There, SUWA claimed that by allowing off-road vehicles in certain Wilderness Study Areas (WSAs), BLM was violating its statutory mandate to manage WSAs "so as not to impair the suitability of such areas for preservation as wilderness." 43 U.S.C. § 1782(c); —— U.S. at ——, 124 S.Ct. at 2380. The Court held, *inter alia,* that the act sought to be compelled under 706(1) must be a specific, discrete action that is legally required. —— U.S. at ——, 124 S.Ct. at 2379. As the Court stated:

> The principal purpose of the APA limitations we have discussed—and of the traditional limitations upon mandamus from which they were derived—is to protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve. *If courts were empowered to enter general orders compelling compliance with broad statutory mandates, they would necessarily be empowered, as well, to determine whether compliance was achieved—which would mean that it would ultimately become the task of the supervising court, rather than the agency, to work out compliance with the broad statutory mandate, injecting the judge into day-to-day agency management.*

*Id.* at 2381 (emphasis added).

In other words, courts may not issue broad declaratory judgments that an agency has failed to comply with its statutory mandate. Yet this is exactly what the Tribes are asking the Court to do—to exercise its broad equitable relief, declare the BLM in violation of its broad trust obligations, and fashion particular remedies such as instructing the BLM to construct a passive water treatment system at the headwaters of King Creek. *See* Plaintiffs' Reply Brief, at 4 (giving examples of

remedies the Court could grant). If courts are prohibited from entering general orders directing agencies to follow the law prospectively, they can hardly be empowered to enter an order observing in retrospect that the agency failed to implement the law and ordering it to take actions that the Court believes are proper.

Moreover, other than declaratory pronouncements that the BLM did in fact violate the law, the injunctive relief sought by the Tribes is directed at either (a) preventing further disturbance of the land, or (b) reclaiming the disturbed lands. Plaintiffs' Reply Brief, at 4. Those remedies are aimed at reclamation of the mines, whether they are specifically included in the 2002 reclamation plan or not. The BLM has already exercised its discretion and expertise by adopting the 2002 Reclamation ROD and SEIS, thereby superseding previous decisions and fashioning a remedy for the Tribes' injuries. Even if the Court could find law to apply, it would be inserting itself into an ongoing administrative process by exercising its equitable powers to fashion suitable remedies for the tribes. Moreover, the fact that the operative decision at the mines is a reclamation plan, and the fact that the mines are no longer operating, casts serious doubt on the Court's jurisdiction to judicially review BLM's earlier decisions.

**C. Statute of Limitations**

■ "Except as provided by the Contract Disputes Act of 1978, every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues." 28 U.S.C. § 2401(a). The six-year statute of limitations begins to run when the right of action first accrues, which, under the APA, is generally the time of the final agency action. 5 U.S.C. § 704.

Having identified the final agency actions that may be challenged by the Tribes in this Court, it must next be determined whether the statute of limitations bars any of the Tribes' claims. The statute of limitations is a condition of the sovereign's consent to be sued. *United States v. Kubrick,* 444 U.S. 111, 117, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979).

■ As is clear from the plain language of the statute, "every civil action commenced against the United States" is subject to the six-year statute of limitations. The statute begins to run when a plaintiff has all necessary facts underlying his claims. *Kubrick,* 444 U.S. at 122, 100 S.Ct. 352. It is not tolled pending the plaintiff's understanding of the legal implications of those facts. *Id.*

The complaint herein was filed on April 12, 2000. The Tribes' challenge is therefore limited to final agency actions taken after April 12, 1994.[3]

The BLM first commented on the Zortman Landusky mines in 1979; it first approved the mines in 1981. The last permitting decision was made in 1996, when the BLM authorized a significant expansion of the mine; however, that decision was vacated by the IBLA, and never implemented due to the bankruptcy of Pegasus Gold Corporation. In fact, rather than expanding Zortman–Landusky, BLM and the state have since been reclaiming them. Moreover, the most recent final agency actions taken by the BLM are decisions approving reclamation alternatives, not decisions approving continued operations.

The government asserts that the last agency decisions regarding active operations at Zortman–Landusky were made in February 1991. The Plaintiff disputes that, asserting that the last decision made

was on October 25, 1996. This Court agreed with Plaintiffs' assertion in its 2001 order denying the motion to dismiss; however, it did not examine the effect of the IBLA's subsequent order vacating the ROD on the Tribes' standing or on the fitness of the claim for judicial review.

It is difficult to see how a decision that was made but never implemented—and subsequently superseded by another final agency action, i.e., the reclamation plan—can have caused an injury in fact. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Lacking an injury flowing from the 1996 decision, the Tribes do not have standing to challenge the 1996 decision.

It is equally logical to conclude that any decisions made to expand the mines are moot. These mines are no longer operating; any injury being caused by them is the result of permitting decisions that are no longer in effect, and will never again be made at these mines. In a similar situation where a Record of Decision was vacated by a lower court, the Ninth Circuit stated:

> As the environmental impact statement supplement upon which the 1992 ROD was based must be supplemented in light of our decision in [*Oregon Natural Resources Council v. Marsh,* 52 F.3d 1485 (9th Cir.1995)] *Marsh VII, that record of decision can no longer be taken as the Corps' operative decision.* Accordingly, we must decline to give an advisory opinion as to its sufficiency.

*Oregon Natural Resources Council v. Harrell,* 52 F.3d 1499, 1508 (9th Cir.1995) (emphasis added). If the 1996 EIS and ROD are no longer the BLM's operative decisions, they are not final agency actions

---

**3.** The Tribes argued that the "continuing violations" doctrine prevents the application of a statute of limitations defense. However, that

doctrine has evolved in the context of tort and nuisance law; it is not applicable in the context of an APA claim for judicial review.

subject to judicial review, and an earlier final agency action must be identified.

It appears from the record that the BLM approved modifications to ZMI operating permits in March 1994, which is outside the statutory time frame. Therefore, the Tribes' claims are barred by 28 U.S.C. § 2401(a).

### D. Mootness

The Tribes concede there is "a live controversy over whether the latest [reclamation] plan will provide an adequate remedy" for their injuries. However, that controversy is not before this Court, although documents from the SEIS were filed with the Court and cited to by both parties. That controversy is before the IBLA, where the Tribes are challenging the reclamation plan. Both parties have the right to appeal the IBLA's ultimate decision to this Court, at which time the Court will have jurisdiction to rule on the adequacy of the reclamation plan.

■ The controversy that *is* before this Court has to do with approval of mine operations that led to the acid rock drainage in the first place. That, however, is not a live controversy. The mines have closed; there is no indication they will reopen. The Tribes' claims for relief are not aimed at mine operation, but instead at mine reclamation.

■ It is in this way that the remedy is relevant to liability. Mootness is jurisdictional; if no case or controversy is presented to the Court, there can be no jurisdiction under Article III.

■ "[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S.

486, 496, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969). "Mootness can be characterized as the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *Cook Inlet Treaty Tribes v. Shalala*, 166 F.3d 986, 989 (9th Cir.1999) (internal quotation marks omitted). Mootness is jurisdictional; "federal courts have no jurisdiction to hear a case that is moot, that is, where no actual or live controversy exists." *Id.* Importantly, "If there is no longer a possibility that an appellant can obtain relief for his claim, that claim is moot and must be dismissed for lack of jurisdiction." *Ruvalcaba v. City of L.A.*, 167 F.3d 514, 521 (9th Cir.1999).

Plaintiffs assert correctly that the "test for mootness in cases such as this is a stringent one." *United States v. Concentrated Phosphate Export Assoc., Inc.*, 393 U.S. 199, 203, 89 S.Ct. 361, 21 L.Ed.2d 344 (1968). A defendant's voluntary cessation of wrongful conduct rarely moots the need for injunctive relief because the defendant can simply begin the wrongful activity again: "Mere voluntary cessation of allegedly illegal conduct does not moot a case; if it did, the courts would be compelled to leave '[t]he defendant . . . free to return to his old ways.'" *Id.* (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 632, 73 S.Ct. 894, 97 L.Ed. 1303 (1953)); *F.T.C. v. Affordable Media*, 179 F.3d 1228, 1238 (9th Cir.1999).

Plaintiffs focus on the fact that acid rock drainage and other pollution from the mines is ongoing to argue that the BLM's wrongful conduct has not stopped and is likely to continue into the future. But BLM's alleged wrong was not in *causing* the pollution; it was in permitting the

mines without adequate consideration of tribal interests. The pollution may be ongoing, but the remedy for that harm lies *not* in enjoining the BLM from approving further expansions. They have already ceased doing so; the mines have been closed for six years, and substantial reclamation work has taken place. The likelihood of the mines reopening appears minuscule—which is why the Plaintiffs do not seek an order closing the mines, or amending the terms of the operating permit. They seek cleanup, remediation, reclamation. Whatever label one chooses to apply, the outcome the Tribes seek falls within the general ambit of the 2002 Reclamation Plan.

For these reasons, the BLM's cessation of mine permitting is jurisdictionally significant. That allegedly wrongful conduct is unlikely to recur. The only wrongful conduct that *is* likely to occur has to do with reclamation. Thus, the earlier decisions are moot, and the reclamation decision has not been brought before this Court. Either way, the Court lacks jurisdiction over the Tribes' claims.

### IV.   Order

Based on the foregoing, IT IS HEREBY ORDERED that the Plaintiffs' motion to amend the judgment (dkt # 125) is DENIED.