# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

GROS VENTRE TRIBE; ASSINIBOINE
TRIBE; THE FORT BELKNAP INDIAN
COMMUNITY COUNCIL OF THE FORT
BELKNAP INDIAN RESERVATION,
            *Plaintiffs-Appellants,*

          v.

UNITED STATES OF AMERICA; UNITED
STATES BUREAU OF LAND
MANAGEMENT, an agency of the
U.S. Dept' of Interior; BUREAU OF
INDIAN AFFAIRS, an agency of the
U.S. Dept' of Interior; and INDIAN
HEALTH SERVICE, an agency of the
U.S. Dept' of Health and Human
Services,
           *Defendants-Appellees.*

No. 04-36167

D.C. No.
CV-00-00069-DWM

OPINION

Appeal from the United States District Court
for the District of Montana
Donald W. Molloy, Chief District Judge, Presiding

Argued and Submitted
June 6, 2006—Seattle, Washington

Filed November 13, 2006

Before: Richard C. Tallman and Jay S. Bybee,
Circuit Judges, and Marilyn L. Huff,* District Judge.

*The Honorable Marilyn L. Huff, United States District Judge for the
Southern District of California, sitting by designation.

18467

Opinion by Judge Tallman

## COUNSEL

Michael D. Axline, Western Environmental Law Center, Sacramento, California, for the plaintiffs-appellants.

John E. Arbab, Trial Attorney, Department of Justice, Environment and Natural Resources Division, Washington, D.C., for the defendants-appellees.

## OPINION

TALLMAN, Circuit Judge:

Appellants Gros Ventre Tribe, Assiniboine Tribe, and the Fort Belknap Indian Community Council (collectively "the Tribes") appeal the district court's order granting summary judgment for the United States. The Tribes filed suit in the District of Montana against the United States, its Bureau of Land Management ("BLM"), the Bureau of Indian Affairs, and the Indian Health Service (collectively "the government"), alleging that the government had violated specific and general trust obligations to protect tribal trust resources (primarily water rights) by authorizing and planning to expand two cyanide heap-leach gold mines located upriver from the Tribes' reservation. We affirm.

The Tribes urge a theory of liability conflating general trust law principles with an attack on agency inaction under the Administrative Procedure Act ("APA"). *See* 5 U.S.C. § 706(1). But none of the treaties cited by the Tribes impose a specific duty on the United States to regulate third parties or non-tribal resources for the benefit of the Tribes. Because

the government's general trust obligations must be analyzed within the confines of generally applicable statutes and regulations, we reject the suggestion to create by judicial fiat a right of action Congress has not recognized by treaty or statute. Therefore, because the Tribes do not have a cognizable non-APA claim, we agree with the district court that the Tribes are required to comply with the APA's "final agency action" requirement. *See id.* § 704. We also hold that after bifurcating the trial into a liability and remedy phase, the district court did not abuse its discretion by granting the government's motion for summary judgment upon conclusion of the liability phase.

I

A

The Gros Ventre and Assiniboine Tribes reside on the Fort Belknap Indian Reservation ("Reservation") located in north-central Montana. Pertinent to this appeal is the fact that in 1851 seven different Indian nations, including the two Tribes, signed the Treaty of Fort Laramie. The Indian nations had "assembled for the purpose of establishing and confirming peaceful relations amongst themselves," and, by signing the treaty, they "agree[d] to abstain in future from all hostilities whatever against each other, to maintain good faith and friendship in all their mutual intercourse, and to make an effective and lasting peace." Treaty of Fort Laramie art. 1, Sept. 17, 1851, 11 Stat. 749. The Tribes also formally recognized "the right of the United States Government to establish roads, military and other posts, within their respective territories." *Id.* at art. 2. In return, the United States agreed to "protect the . . . Indian nations against the commission of all depredations by the people of the said United States." *Id.* at art. 3. The Treaty of Fort Laramie did not convey any land to the Indians "but instead chiefly represented a covenant among several tribes which recognized specific boundaries for their

respective territories." *Montana v. United States*, 450 U.S. 544, 553 (1981).

The United States made a similar promise to protect the Tribes and their territory in the 1856 Treaty with the Blackfeet. The Tribes "agree[d] that citizens of the United States may live in and pass unmolested through the countries respectively occupied and claimed by them." Treaty with the Blackfeet art. 7, Oct. 17, 1855, 11 Stat. 657. The United States agreed to be "bound to protect said Indians against depredations and other unlawful acts which white men residing in or passing through their country may commit." *Id.*

In 1888, Congress ratified an agreement to reduce the territory of the Gros Ventre, Piegan, Blood, Blackfeet, and River Crow Indian Tribes. *See* An Act to Ratify and Confirm an Agreement with the Gros Ventre, ch. 213, May 1, 1888, 25 Stat. 113. In return, Congress created the original Fort Belknap Indian Reservation, an area of land specifically set aside for the use and enjoyment of the Indian tribes. Although a reduction of their former territory, the original Fort Belknap Indian Reservation included the Little Rocky Mountains of Montana, a location long used by the Tribes for subsistence, social, and religious purposes.

In the early 1880s, prior to the formation of the original Fort Belknap Indian Reservation, gold was discovered on the southern slopes of the Little Rocky Mountains. Congress soon realized that the larger part of the mineral-bearing country was located within the boundaries of the newly delineated Fort Belknap Indian Reservation. In 1896, Congress ratified what later became known as the "Grinnell Agreement," wherein the Tribes agreed to relinquish all right, title, and interest to the mineral-bearing portion of the Little Rocky Mountains in return for certain monetary considerations. Agreement with the Indians of the Fort Belknap Indian Reservation in Montana, ch. 398, 29 Stat. 350 (1895). While not articulated in the agreement ratified by Congress, it was

reported to the Senate that the commission authorized to negotiate with the Fort Belknap Indian tribes had assured the tribes that they "would not be giving up any of their timber or grasslands . . . and that they would have ample water for all their needs." S. Doc. No. 54-117, at 3-4 (1896). Within the next ten years, the Little Rocky Mountains mining district became Montana's largest gold producer.

The advent of cyanide heap-leach technology,[1] in conjunction with a sharp rise in gold prices, prompted the development of open pit mining operations beginning in the late 1970s. In 1979, the Montana Department of State Lands issued permits to Zortman Mining, Inc. ("ZMI"), a wholly owned subsidiary of Pegasus Gold, Inc. ("Pegasus"), authorizing the Zortman and Landusky cyanide heap-leach mines. Both mines are located near the southern boundary of the Reservation. The BLM did not establish federal regulations controlling the operation of mines on public lands until 1981. At that time, the BLM approved the Zortman and Landusky mines as pre-existing authorizations under its newly promulgated regulations. The BLM issued a Plan of Operation for each mine, and both plans were amended numerous times between 1979 and 1991.

In 1992, ZMI proposed to expand the Zortman mine. In the course of reviewing the proposed Zortman expansion, the

---

[1]Cyanide heap leaching is a process used to recover microscopic gold particles typically found in low-grade ore deposits. The process includes drilling, blasting and crushing low-grade ore. The ore is then transferred to a leach pad, a carefully constructed series of flat-topped heaps that is lined with plastic and/or clay to try and prevent the loss of solution. The leach pad is also constructed in lifts, which are sequentially sprayed with a cyanide solution. Once processed, a "pregnant solution" containing the gold particles is collected, processed in tanks or treatment cells, and heated in a furnace to form impure gold/silver ore bars for further refinement. U.S. DEP'T OF INTERIOR, BUREAU OF LAND MGMT. & MONT. DEP'T OF ENVTL QUALITY, FINAL ENVTL. IMPACT STATEMENT, ZORTMAN AND LANDUSKY MINES, RECLAMATION PLAN MODIFICATIONS AND MINE LIFE EXTENSIONS 1-10 (1996) [hereinafter 1996 FEIS].

BLM and the Montana Department of State Lands determined that acid rock drainage ("ARD")[2] had become a widespread problem at both the Zortman and Landusky mines. Despite these findings, in 1996, the BLM and the Montana Department of Environmental Quality[3] issued an Environmental Impact Statement ("EIS") and Record of Decision ("ROD") approving a proposed expansion of mining operations at both locations. In late 1996, the Tribes appealed that decision to the Interior Board of Land Appeals ("IBLA"). In 1998, before the IBLA issued a decision on the merits, Pegasus and ZMI filed for bankruptcy. Consequently, the companies abandoned their plans to expand and announced that they would reclaim and close the mines. Ultimately, the IBLA found that the 1996 ROD did not comply with the National Environmental Policy Act ("NEPA"), the Federal Land Policy and Management Act ("FLPMA"), or the government's trust obligations to the Tribes. *See Island Mountain Protectors*, 144 IBLA 168 (May 29, 1998).

On June 1, 1998, the BLM issued a second ROD requiring reclamation of existing disturbances using agency-developed mitigation tactics. In doing so, it rescinded the 1996 ROD authorizing mine expansion. Because the BLM relied on the 1996 EIS in preparing the 1998 ROD, the IBLA denied the BLM's motion for reconsideration and vacated the 1998 ROD on the same grounds it had cited to vacate the earlier decisions. In response to the IBLA's decision, the BLM and the State of Montana engaged in consultation with the Tribes. The agency issued a Final Supplemental Environmental Impact Statement ("SEIS") in 2001 and signed a new ROD in May 2002.

---

[2]ARD occurs when rock containing sulfides is exposed to air and water during mining operations. The water becomes acidic, sometimes containing metals such as lead, arsenic, zinc, copper, and silver. Bacteria present in mine water can accelerate the rate of acid generation because of their ability to oxidize sulfide-bearing materials. 1996 FEIS, 1-9.

[3]The Montana Department of Environmental Quality is the successor agency to the Montana Department of State Lands.

B

In April 2000, the Tribes filed suit claiming that the government breached its trust responsibility to the Tribes by approving, permitting, and failing to reclaim the Zortman and Landusky mines, the operation of which had diminished and continues to diminish the quality and quantity of water resources available to the Tribes. The Tribes further alleged that the government failed to consult with the Tribes, and consider their spiritual, cultural, and religious interests in the Little Rocky Mountains. According to the Tribes, the government breached its common law trust obligations by failing to take action that it was legally required to take, or by acting in a fashion that was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. *See* 5 U.S.C. § 706. The Tribes filed an equitable action, asking the district court to (1) declare that the government violated its fiduciary duty to protect tribal trust resources, (2) find that the government's failure to comply with the NEPA and other statutory mandates constituted an unnecessary and undue degradation in violation of the FLPMA, (3) issue a writ of mandamus compelling the government to comply with its trust responsibilities, and (4) enjoin the government from further destruction of tribal trust resources.

On January 29, 2001, the district court denied the government's motion to dismiss for lack of subject matter jurisdiction or failure to state a claim. The government had argued that the Tribes' claims were subject to all of the requirements of the APA. Consequently, the government asserted that the district court lacked jurisdiction to consider any claim that did not involve a "final agency action" and that the "final agency actions" that had occurred prior to 1994 were barred by the six-year statute of limitation.

The Tribes countered by arguing that the APA's waiver of sovereign immunity applies to non-APA claims, as well as APA claims. They contended that their common law trust

claim could be raised independent of the APA and other statutes and, therefore, they were not limited to challenging only final agency actions.

The district court initially agreed with the Tribes and denied the government's motion to dismiss. Reading the complaint in the light most favorable to the Tribes, the district court found that the Tribes' common law claims were more like private nuisance claims—rather than an action stemming directly from administrative proceedings—and it agreed that "the trust relationship between the Tribes and the federal government provide[d an] independent basis to proceed." Therefore, because the district court concluded that the APA's waiver of sovereign immunity applied to non-APA claims, as well as APA claims, the Tribes were not constrained by the final agency action requirement.

On November 30, 2001, the district court issued an order bifurcating the trial into a liability phase and a remedy phase. In December 2002, the parties filed cross-motions for summary judgment, and upon the district court's order they renewed those motions in 2003.

On June 28, 2004, the district court granted the government's motion for summary judgment. Recognizing that "[t]he Tribes are not challenging the 2002 [sic] SEIS and ROD," the district court determined that the Tribes failed to challenge any "final agency action" as required by the APA.[4] Moreover, it reasoned that "although damages have been bifurcated from liability, the lack of an effective remedy for any wrongs committed on the Tribes render[ed] the exercise of judicial power superfluous, and the case moot." The BLM withdrew the plan to expand the mines, and, therefore "the actions of which the Tribes complain either cannot be undone or have already been undone." Consequently, "the [district

---

[4]While this appeal was pending, the IBLA dismissed the Tribes' challenge to the 2001 SEIS and 2002 ROD as moot.

court] siting in equity ha[d] little to offer the Tribes until and unless they seek judicial review of the 2002 [sic] SEIS and ROD."

Subsequently, the Tribes filed a Motion to Amend Judgment. On October 22, 2004, the district court denied the Tribes' motion in a published order but clarified its reasoning. *See Gros Ventre Tribe v. United States*, 344 F. Supp. 2d 1221 (D. Mont. 2004). The district court stated that it had reconsidered its prior order denying the government's motion to dismiss sua sponte. *Id.* at 1223. It now believed that the Tribes' claims were subject to all APA provisions, including the "final agency action" requirement.[5] *Id.* at 1226. Moreover, as an alternative holding, the district court concluded that the Tribes' common law claims must fail because the Tribes could not state a cognizable claim that the government had failed to satisfy any other statutory obligations, whether directed at protecting the Tribes or the environment in general. As the district court stated, "In the absence of a specific duty, or specific control over tribal property, the government fulfills its obligations as a trustee for the Tribes if it complies with applicable statutes." *Id.* "[T]he trust obligation is not elevated to an independent source of law," and, because it determined that the Tribes' failure to act claims under FLPMA were not reviewable, the district court concluded that the Tribes' common law rights were not independently enforceable under the APA. *Id.* at 1227.

---

[5]Specifically, the district court stated the following:

> [B]ecause the APA waives the government's sovereign immunity, the APA establishes the necessary prerequisites to the court's jurisdiction. "[T]he terms of [the government's] consent to be sued in any court define that court's jurisdiction to entertain the suit." *United States v. Sherwood*, 312 U.S. 584, 586 (1941). Judicial review under § 702 is expressly conditioned, under § 704, on the existence of a 'final' agency action.

*Gros Ventre Tribe*, 344 F. Supp. 2d at 1226 (second and third alterations in original).

Consequently, because the statute of limitation for any civil claim against the government is six years, the Tribes' claims were limited to final agency actions taken after April 12, 1994.[6] *Id.* at 1229. Although the 1996 ROD was a "final agency action" and occurred within the six-year statute of limitation, that ROD was later superseded by another "final agency action," which the Tribes did not challenge. *Id.* Therefore, the district court concluded that because the Tribes "[l]ack[ed] an injury flowing from the 1996 decision, [they did] not have standing to challenge the 1996 decision." *Id.* The district court went on to hold that the controversy over the BLM's approval of the entire mine operation is now moot because the mines have closed, and there is no indication that they will reopen. *Id.* at 1230. The Tribes timely appealed.

## II

A district court's decision to grant summary judgment is reviewed de novo. *Buono v. Norton*, 371 F.3d 543, 545 (9th Cir. 2004). Its decision regarding the management of litigation is reviewed for an abuse of discretion. *Muckleshoot Tribe v. Lummi Indian Tribe*, 141 F.3d 1355, 1358 (9th Cir. 1998).

## III

### A

The parties go to great pains to argue the issue whether the APA's waiver of sovereign immunity under 5 U.S.C. § 702 for non-monetary actions against the government is conditioned upon the party's challenging a "final agency action" as set forth in 5 U.S.C. § 704. We now recognize that there is a conflict in our caselaw regarding this issue; however, we need

---

[6]The government raised the statute of limitation defense in its original motion to dismiss.

not resolve it as we affirm the district court on its alternative holding.[7]

The government argues that this case is controlled by the Ninth Circuit's decision in *Gallo Cattle Co. v. U.S. Department of Agriculture*, 159 F.3d 1194 (9th Cir. 1998). There, we specifically stated that "the APA's waiver of sovereign immunity contains several limitations," including § 704's "final agency action" requirement. *Id.* at 1198. Because the appellants in *Gallo Cattle* failed to challenge a "final agency action," the express waiver of sovereign immunity did not apply, and 28 U.S.C. § 1331 could not vest the district court with jurisdiction. *Id.* at 1199.

The Tribes attempt to distinguish *Gallo Cattle* on the ground that it involved a request for judicial review of agency action and not common law claims seeking equitable relief for agency violations of common law duties. They argue that § 702 waives sovereign immunity in non-statutory review actions for non-monetary relief brought under 28 U.S.C. § 1331. *See Assiniboine & Sioux Tribes of the Fort Peck Indian Reservation v. Bd. of Oil & Gas Conservation*, 792 F.2d 782, 793 (9th Cir. 1986) ("This Court has held that section 702 does waive sovereign immunity in non-statutory review actions for non-monetary relief brought under 28 U.S.C. § 1331."). Therefore, they contend that § 702's waiver

---

[7]Although we refer to this as an "alternative holding" we do not agree with the parties that this was dicta by the district court. The court was troubled by whether the Tribes—independent of any applicable statute— had a substantive right to enforce. *See Gros Ventre Tribe*, 344 F. Supp. 2d at 1227 ("Nowhere do I find judicial support for the notion that the trust obligation can be enforced independently of some other source of law."); *id.* ("Even if the Court assumes the truth of Plaintiffs' allegation that those non-reservation activities have affected tribal property, the trust obligation is not elevated to an independent source of law."). Because the trust obligation cannot be independently enforced, the Tribes need to rely on statutes as the source of their substantive rights. In this case, their statutorily based claims can only be brought under the APA, as the statutes contain no private right of action. *See infra* § III.C.

applies to more than "just judicial review cases under the APA" and that there is "no common law 'final agency action' requirement."**[8]**

The Tribes' position is supported by *The Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518 (9th Cir. 1989), where we rejected the Immigration & Naturalization Service's ("INS") argument that § 702's waiver of sovereign immunity is limited to only "agency actions" as defined by the APA. *Id.* at 526. In *The Presbyterian Church*, "[t]he INS'[s] argument [wa]s premised on the first sentence of § 702, enacted in 1946, which reads: 'A person suffering legal wrong because of any *agency action*, or adversely affected or aggrieved by such action within the meaning of any relevant statute, shall be entitled to judicial review thereof.' " *Id.* at 524-25 (quoting 5 U.S.C. § 702). Therefore, because it believed that the challenged actions in *The Presbyterian Church* were not "agency actions,"**[9]** the INS argued that

---

**[8]**The out-of-circuit cases cited by the Tribes do not lend support to their argument that the "APA provisions have no relevance to non-statutory common law claims." In *Chamber of Commerce v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996), although the appellants argued that § 702 applied to their non-APA cause of action, the court never reached that issue. Instead, citing the ultra vires doctrine set out by the Supreme Court in *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682 (1949), the D.C. Circuit held that "there [wa]s no sovereign immunity to waive [because] it never attached in the first place." *Reich*, 74 F.3d at 1329. The court reached a similar holding in *Clark v. Library of Congress*, 750 F.2d 89, 102 (D.C. Cir. 1984) (determining that § 702 did not apply because the Library of Congress is not an "agency" as defined by the APA but nonetheless concluding that sovereign immunity did not bar the suit because "the challenged actions of the officials [we]re alleged to be unconstitutional or beyond statutory authority"). *But see Cobell v. Babbitt*, 30 F. Supp. 2d 24, 33-35 (D.D.C. 1998) (rejecting the argument that the plaintiffs must state a "final agency action" as defined by § 704 in order for the waiver of sovereign immunity under § 702 to apply).

**[9]**Because it concluded that § 702's waiver of sovereign immunity is not conditioned on challenging an "agency action," the court never reached the issue of whether the challenged actions were "agency actions" within the meaning of 5 U.S.C. § 551(13). *The Presbyterian Church*, 870 F.2d at 525 n.8.

§ 702's waiver of sovereign immunity did not apply. *Id.* at 525.

**[1]** We see no way to distinguish *The Presbyterian Church* from *Gallo Cattle*. Under *The Presbyterian Church*, § 702's waiver is not conditioned on the APA's "agency action" requirement. Therefore, it follows that § 702's waiver cannot then be conditioned on the APA's "final agency action" requirement. *See Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 510 n.4 (1999) (Souter, J., dissenting) ("[The waiver of sovereign immunity found in 5 U.S.C. § 702] is not restricted by the requirement of final agency action that applies to suits under the [APA]." (citing *The Presbyterian Church*, 870 F.2d at 523 26)). But that is directly contrary to the holding in *Gallo Cattle* where we stated that "the APA's waiver of sovereign immunity contains several limitations," including § 704's final agency action requirement. 159 F.3d at 1198.

**[2]** Nevertheless, we need not make a sua sponte en banc call to resolve this conflict because, as we discuss below, the Tribes do not have a common law cause of action for breach of trust. *Cf. United States v. Torres-Hernandez*, 447 F.3d 699, 704 (9th Cir. 2006) (declining to make a sua sponte en banc call to address an intra-circuit conflict when the court could affirm under either standard). Therefore, because the statutes that the Tribes cite authorize no private right of action, the Tribes must state their claims within the confines of the APA.

B

The Tribes argue that the APA's "final agency action" requirement is inapplicable because they have presented the court with simple common law trust claims based upon clearly identified and ongoing injuries. Even if the Tribes were correct about whether the "final agency action" requirement applies to non-APA claims relying on § 702's waiver of sovereign immunity, the Tribes cannot allege a common law

cause of action for breach of trust that is wholly separate from any statutorily granted right. *See Cobell v. Babbitt*, 91 F. Supp. 2d 1, 28 (D.D.C. 1999) ("[The tribes] cannot state common-law claims for breach of trust against these federal officials in the context of financial mismanagement of the [Individual Indian Money] trust. 'There is no such thing as a common law judicial review in the federal courts.' " (quoting *Stark v. Wichard*, 321 U.S. 288, 312 (1994) (Frankfurter, J., dissenting))).

**[3]** We recognize that there is a "distinctive obligation of trust incumbent upon the Government in its dealings with [Indian tribes]." *United States v. Mitchell* (*Mitchell II*), 463 U.S. 206, 225 (1983) (quoting *Seminole Nation v. United States*, 316 U.S. 286, 296 (1942)). That alone, however, does not impose a duty on the government to take action beyond complying with generally applicable statutes and regulations. *Shoshone-Bannock Tribes v. Reno*, 56 F.3d 1476, 1482 (D.C. Cir. 1995) ("[A]n Indian tribe cannot force the government to take a specific action unless a treaty, statute or agreement imposes, expressly or by implication, that duty."); *Vigil v. Andrus*, 667 F.2d 931, 934 (10th Cir. 1982) ("[T]he federal government generally is not obligated to provide particular services or benefits in the absence of a specific provision in a treaty, agreement, executive order, or statute."); *Miccosukee Tribe of Indians of Fla. v. United States*, 980 F. Supp. 448, 461 (S.D. Fla. 1997) ("[T]he government assumes no specific duties to Indian tribes beyond those found in applicable statutes, regulations, treaties or other agreements."). Although the Tribes may disagree with the current state of Ninth Circuit caselaw, as it now stands, "unless there is a specific duty that has been placed on the government with respect to Indians, [the government's general trust obligation] is discharged by [the government's] compliance with general regulations and statutes not specifically aimed at protecting Indian tribes." *Morongo Band of Mission Indians v. FAA*, 161 F.3d 569, 574 (9th Cir. 1998); *see also Okanogan Highlands Alliance v. Williams*, 236 F.3d 468, 479 (9th Cir. 2000), *Skokomish*

*Indian Tribe v. FERC*, 121 F.3d 1303, 1308-09 (9th Cir. 1997), *Inter Tribal Council of Arizona, Inc. v. Babbitt*, 51 F.3d 199, 203 (9th Cir. 1995).[10]

In *Vigil*, the Tenth Circuit declined to find that, within the federal government's broad fiduciary obligations to Indian tribes, there lies a specific duty to provide free lunches to all Indian children. 667 F.2d at 934. Stating that "the federal government generally is not obligated to provide particular services or benefits in the absence of a specific provision in a treaty, agreement, executive order, or statute," the court concluded that language in treaties referring to the government's obligation to support and educate Indians was too broad and did not expressly impose a duty on the government to provide free lunches to all Indians. *Id.*

Similarly, in *Shoshone-Bannock Tribes*, the D.C. Circuit held that a provision in the Treaty of Fort Bridger of July 3, 1868, 15 Stat. 673, giving the tribes a right to hunt on "the unoccupied lands of the United States so long as game may be found thereon" did not impose a duty on the United States to litigate water-rights claims on the tribes' behalf. 56 F.3d at 1478, 1482 (internal quotation marks omitted). The court concluded that the broad provision within the Treaty "d[id] not suggest in the slightest that upon the Tribes' request, the United States is bound to file and defend meritless claims to water rights," and, "[w]ithout an unambiguous provision by Congress that clearly outlines a federal trust responsibility, courts must appreciate that whatever fiduciary obligation otherwise exists[ ] it is a limited one only." *Id.* at 1482 (internal

---

[10]We are leaving open the question of whether the United States is required to take special consideration of tribal interests when complying with applicable statutes and regulations and when such an obligation may or may not arise. *See Island Mountain Protectors*, 144 IBLA at 185 (stating that, because the Tribes had treaties, "[the] BLM was required to consult with the Tribes and to identify, protect, and conserve trust resources, trust assets, and Tribal health and safety" in its administration of the NEPA and other environmental laws).

quotation marks omitted); *see also Miccosukee Tribe of Indians of Florida*, 980 F. Supp. at 456, 461, 463 (rejecting the tribes argument that the federal government had a fiduciary obligation to accede to its request to take certain actions to alleviate flooding on tribal land caused by Tropical Storm Gordon because "[t]he Tribe ha[d] not introduced evidence that the Federal Defendants assumed a duty under any of these statutes and agreements to provide the Tribe with the flood relief it has requested").

**[4]** In this case, the Tribes argue that the government has failed to properly consider tribal interests in the approval and permitting of the Zortman and Landusky mining operations. Morever, they argue that the BLM's failure to fully reclaim the mines and restore the quantity and quality of the Tribes' water resources constitutes an ongoing breach of the government's trust obligations. But their claim is no different from that which might be brought under the generally applicable environmental laws available to any other affected landowner, subject to the same statutory limitations. We also think this situation is unique from other cases where courts have required the United States to comply with a specific fiduciary obligation; here, the Tribes seek to impose a duty, not found in any treaty or statute, to manage non-tribal property for the benefit of the tribes. *Cf. United States v. Mitchell* (*Mitchell I*), 445 U.S. 535, 538 (1980) (holding that the United States does not have a specific fiduciary obligation to manage timber resources on allotted lands, held in trust for Indian-allotees); *United States v. Mason*, 412 U.S. 391, 393, 398, 400 (1973) (finding that the United States had not breached its trust responsibility in the management of allotted land held in trust for a member of the Osage Tribe); *Seminole Nation*, 316 U.S. at 296-300 (recognizing that the United States may have breached its fiduciary duty in its management of Indian annuities); *Minnesota v. United States*, 305 U.S. 382, 386 (1939) (stating that "the owner of the fee of the Indian allotted lands holds the same in trust for the allottees").

In *Mitchell I*, the seminal case dealing with the fiduciary trust obligations owed by the government to federally recognized Indian tribes, the Supreme Court declined to find that the United States had a specific fiduciary obligation to manage timber resources on the allotted lands for the benefit of Indian-allottees, even when there was statutory language expressly recognizing that the United States held these lands in trust. 445 U.S. at 541-42; *see also Marceau v. Blackfeet Housing Auth.*, 455 F.3d 974, 983 (9th Cir. 2006) ("In *Mitchell I* . . . the Supreme Court found that the General Allotment Act, under which tribal land was taken into trust, created only a limited trust relationship between the United States and the tribal member as it related to timber management."). The Court noted that the General Allotment Act did not "*unambiguously* provide that the United States has undertaken full fiduciary responsibilities as to the management of allotted lands." *Mitchell I*, 445 U.S. at 542 (emphasis added). Furthermore, neither its legislative history nor any of the events surrounding the Act's passage gave any indication that Congress intended "the Government to manage timber resources for the benefit of Indian allottees." *Id.* at 545.

The Tribes argue that *Mitchell I* and *Mitchell II* apply only to claims for monetary damages. In other words, the Tribes contend that, when a party seeks monetary relief, *Mitchell I* and *Mitchell II* require a substantive source of law that establishes a specific fiduciary duty that can be fairly interpreted as mandating compensation for damages sustained as a result of a breach of the duty imposed. However, the Tribes contend that the government still maintains a general trust responsibility towards them and this responsibility exists for any federal action that relates to Indian tribes. Therefore, in their view— despite Ninth Circuit caselaw to the contrary—this general trust obligation cannot be satisfied simply through facial compliance with statutory and regulatory requirements. And, for § 702 claims for non-monetary damages, the general trust obligation imposes duties on the federal government even in the absence of a specific treaty, agreement, executive order,

or statute. However, we are not in a position to overrule prior precedent. In *Morongo Band of Mission Indians*, 161 F.3d 569, the Morongo Band of Mission Indians sought non-monetary relief under the APA. *Id.* at 573. Although we recognized that "the United States does owe a general trust responsibility to Indian tribes," we stated that "unless there is a specific duty that has been placed on the government with respect to Indians, this responsibility is discharged by the agency's compliance with general regulations and statutes not specifically aimed at protecting Indian tribes." *Id.* at 574; *see also N. Slope Borough v. Andrus*, 642 F.2d 589, 612 (D.C. Cir. 1980) ("Without an unambiguous provision by Congress that clearly outlines a federal trust responsibility, courts must appreciate that whatever fiduciary obligation otherwise exists, it is a limited one only."). This is the law of the circuit, and this is the law we must follow.

[5] Here, the Tribes cite the Treaty of Fort Laramie, the Treaty with the Blackfeet, and the Grinnell Agreement as instances where the government has committed itself to specific fiduciary obligations in the management of water resources existing off of the Reservation. However, nowhere do we find the government "unambiguously agreeing" to manage off-Reservation resources for the benefit of the Tribes. *See Mitchell I*, 445 U.S. at 542. Rather, at most, the treaties merely recognize a general or limited trust obligation to protect the Indians against depredations on Reservation lands: an obligation for which we have no way of measuring whether the government is in compliance, unless we look to other generally applicable statutes or regulations.

Morever, unlike *Mitchell I* and *Mitchell II*, where the tribes sought to impose a specific fiduciary obligation on the United States to manage timber located on *tribal* land, the Tribes here seek to impose a duty on the government to manage resources that exist off of the Reservation. Essentially, this amounts to a duty to regulate third-party use of non-Indian resources for the benefit of the Tribes. We are not aware of any circuit or

Supreme Court authority that extends a specific *Mitchell*-like duty to non-tribal resources. Indeed, as we recently stated in *Marceau*, the government does not bear complete fiduciary responsibility unless it has "take[n] full control of a *tribally-owned* resource and manage[d] it to the exclusion of the tribe." 455 F.3d at 984 (emphasis added); *see also id.* at 984 ("[F]iduciary duties arise under *Mitchell* only where the federal government pervasively regulates a tribally-owned resource."); *Inter Tribal Council of Arizona, Inc.,* 51 F.3d at 203 (finding no *Mitchell*-like trust duty because "[t]he off-reservation school was not part of Indian lands, but was merely allocated by the BIA for use by the Tribes"). Therefore, because the tribes in *Marceau* failed to show how funding from the Department of Housing and Urban Development could be a tribal resource, the court held that no *Mitchell* fiduciary duty existed.

Nothing in the treaties or the Grinnell Agreement gives any indication that Congress intended to impose such a duty on the government. For instance, in the Treaty with the Blackfeet, the United States agreed to "protect said Indians against depredations and other unlawful acts which white men residing in or passing through their country may commit." Treaty with the Blackfeet, art. 7. This provision obligates the government to protect only against those depredations that occur on Indian land. While we recognize that the area of concern in this case was actually considered to be a part of the Tribes' territory at the time the Treaty with the Blackfeet was ratified, it cannot be said that the United States agreed to manage that land for the benefit of the Tribes in perpetuity, even after the Tribes later relinquished their ownership in that land. Whatever duty exists at law today must be expressly set forth in statutes or treaties.

Moreover, we believe that this language gives some indication as to what Congress intended when it ratified the Treaty of Fort Laramie. In article 2 of that treaty, the Indian nations "recognize[d] the right of the United States Government to

establish roads, military and other posts, within their respective territories." In article 3 of the treaty—upon which the Tribes rely—it reads: "In consideration of the rights and privileges acknowledged in the preceding article, the United States bind themselves to protect the aforesaid Indian nations against the commission of all depredations by the people of the said United States, after the ratification of this treaty." Treaty of Fort Laramie, art. 3.

**[6]** When we read these two articles together it is clear that —as in the Treaty with the Blackfeet—the United States agreed to protect the Tribes from depredations that occurred only on tribal land. Although we recognize that activities occurring off of the Reservation may impact resources on the Reservation, the language in these treaties simply cannot be read to impose a specific fiduciary obligation on the government to manage non-tribal resources, such as the clean-up of nearby gold mine tailings, for the benefit of the Tribes. As the Supreme Court has stated, the purposes of this treaty were to "assure safe passage for settlers across the lands of various Indian Tribes; to compensate the Tribes for the loss of buffalo, other game animals, timber, and forage; to delineate tribal boundaries; to promote intertribal peace; and to establish a way of identifying Indians who committed depredations against non-Indians." *Montana*, 450 U.S. at 557-58; *see also id.* at 553 (stating that the Treaty of Fort Laramie "chiefly represented a covenant among several tribes which recognized specific boundaries for their respective territories").

## C

Because we conclude that the Tribes cannot allege an independent common law cause of action for breach of trust, we turn now to their statutory claim. In addition to its breach of trust claim, the Tribes also sought summary judgment against the government for allegedly failing to prevent unnecessary and undue degradation of public lands in violation of FLPMA.[11]

---

[11]Specifically, the Tribes alleged that the government's failure to comply with NEPA, 42 U.S.C. §§ 4321-4347, and the National Historic Pres-

The FLPMA is primarily procedural in nature, and it does not provide a private right of action. *Ctr. for Biological Diversity v. Veneman,* 394 F.3d 1108, 1111 (9th Cir. 2005). Therefore, the Tribes sought relief under § 706(1) of the APA for failure to act.

**[7]** In *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55 (2004), the Supreme Court stated that "[a failure to act claim] under [5 U.S.C.] § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." *Id.* at 64. As such, courts do not have the authority to "enter general orders compelling compliance with broad statutory mandates." *Id.* at 66. Even assuming that the government has a common law trust obligation that can be tied to its statutorily mandated duties under FLPMA, the Tribes have no basis for arguing that these obligations require the government to take discrete nondiscretionary actions. Therefore, the district court properly dismissed the Tribes' "failure to act" claim for lack of jurisdiction.

**[8]** In so far as the Tribes relied on the APA to assert a claim for relief based on alleged violations of NHPA or NEPA, the district court correctly determined that it lacked jurisdiction. Neither statute provides a private right of action; therefore, the Tribes must rely on the APA to state a claim. *See San Carlos Apache Tribe v. United States*, 417 F.3d 1091, 1098-99 (9th Cir. 2005) (concluding that § 106 of the NHPA does not contain an implied right of action); *Turtle Island Restoration Network v. U.S. Dep't of Commerce*, 438 F.3d 937, 942 (9th Cir. 2006) (recognizing that NEPA does not provide a private right of action). The only "final agency action" that occurred within the six-year statute of limitation period[12] is the now-vacated 1996 ROD.[13] The district court

---

ervation Act (NHPA), 16 U.S.C. §§ 470-470x-6, constituted unnecessary and undue degradation.

[12]The "general six-year statute of limitations for civil actions brought against the United States, *see* 28 U.S.C. § 2401(a), applies to actions for

properly concluded that because the Tribes could not allege an injury based on the 1996 ROD, they do not have standing to challenge that decision. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (stating that standing—at a minimum—requires (1) injury in fact, (2) a causal connection between the injury alleged and the challenged action, and (3) a likelihood that the injury will be redressed by a favorable decision). Therefore, the district court did not have jurisdiction over these APA claims.

### IV

Finally, the Tribes argue that the district court abused its discretion by granting the government's motion for summary judgment based on a finding that remedies were not available at the conclusion of the liability phase and before the Tribes had an opportunity to present evidence pertaining to possible remedies. In its original order, the district court did state that "although damages have been bifurcated from liability, the lack of an effective remedy for any wrongs committed on the Tribes renders the exercise of judicial power superfluous, and the case moot." However, in its subsequent order, the district court clarified its reasoning. It explained that it chose to reconsider its prior ruling regarding jurisdiction sua sponte, and, because the Tribes did not have standing to challenge the only "final agency action" that had occurred within the applicable statute of limitation, it lacked jurisdiction to consider the Tribes' claims.

[9] It is now apparent that the district court did not grant the government's motion for summary judgment based on a lack of any effective remedy. Rather, the district court granted the government's motion because the Tribes' claims were either

---

judicial review brought pursuant to the [APA]." *Wind River Mining Corp. v. United States*, 946 F.2d 710, 712-13 (9th Cir. 1991).

[13]The Tribes do not challenge the 2001 SEIS or 2002 ROD.

barred by the statute of limitation, not based on a "final agency action," or did not involve a controversy for which the Tribes had standing to pursue. A court has an obligation to consider its jurisdiction at every stage of the proceedings. *See Scholastic Entm't, Inc. v. Fox Entm't Group, Inc.*, 336 F.3d 982, 985 (9th Cir. 2003). The parties had thoroughly briefed these issues when the district court initially considered the government's motion to dismiss. *Cf. id.* (stating that the district court's sua sponte dismissal for lack of jurisdiction did not deprive the appellant of due process because the parties had previously briefed the issue). Therefore, the district court did not abuse its discretion by reconsidering its jurisdiction at the conclusion of the liability phase.

V

**[10]** Nothing within any of the statutes or treaties cited by the Tribes imposes a specific duty on the government to manage non-tribal resources for the benefit of the Tribes. Because the Tribes do not have a common law claim for breach of trust —i.e., one that can be raised independently of any applicable statutes or regulations—the Tribes are forced to rely on the APA for a private right of action. In applying the APA to the Tribes' claims, the district court properly concluded that the Tribes did not have standing to challenge the vacated 1996 EIS or ROD. Moreover, the Tribes did not have a cognizable failure to act claim because the Tribes could not assert that the government has failed to take a discrete agency action that it is legally required to take. Therefore, the district court correctly dismissed the Tribes' claims for lack of jurisdiction.

**AFFIRMED.**